**BARKER et al. v. TEMPLE LUMBER CO. et al. (No. 1110–5028.)**

Commission of Appeals of Texas, Section A.
Jan. 2, 1929.

John Hancock, of Fort Worth, and James G. Barker, of Hemphill, for plaintiffs in error.

Minton & Minton and W. F. Goodrich, all of Hemphill, R. E. Minton, of Lufkin, Davis & Davis and W. I. Davis, all of Center, S. W. Blount, of Nacogdoches, A. D. Lipscomb, of Beaumont, and Mooney, Adams & Hamilton, of Jasper, for defendants in error.

NICKELS, J. For a general statement of the case, reference is made to the opinion of the Court of Civil Appeals (298 S. W. 477).

Writ of error was allowed, principally, upon assignment challenging decision that the instrument discussed in that opinion is without effect to convey a present interest.

■ 1. The granting clause of the "power of attorney" is that grantors "have this day bargained, sold and conveyed, and by these presents do bargain, sell and convey * * * an undivided one-half interest in the above described tracts or parcels of land." The "above described tracts or parcels of land" (it is stated in the paper) are "all tracts or parcels of land we may own at this time in the County of Sabine, State of Texas." The recitals furnished means of identification of the lands dealt with, and, in our opinion, the conveyance itself took effect upon delivery of the instrument. Witt v. Harlan, 66 Tex. 660, 2 S. W. 41; Garner v. Boyle, 97 Tex. 460, 79 S. W. 1066. We do not, of course, mean to imply that the contract as a whole was not largely executory; what we do hold is that in its conveyance it presently transferred a title.

Authorities cited contra are distinguishable. The instrument considered in Haglett & Dickey v. Harwood, 80 Tex. 508, 16 S. W. 310, could not "be treated as a deed for any particular land because it describes none"; its conveyance had relation only to such "lands or land certificates" as the attorneys (grantees) might "obtain for us," and that which was thus left uncertain could not be rendered certain until by futuro action some "lands or land certificates" should be procured in the manner indicated in the power. In Tayler v. Taul, 88 Tex. 665, 32 S. W. 866, it is recognized that, if, in the granting clause of the instrument then being reviewed, the words "lands described in this power of attorney" (i. e., "all such lands * * * whatsoever in the State of Texas, whereof or whereto we are *. * * entitled or interested * * *") had been used without the restrictive words "lands contemplated in this power of attorney," no "further act on the part of Tayler" (grantee) would have been required to bring the lands "within the purview of the instrument"; reasons why "lands contemplated in this power of attorney" became restrictive so as to render the conveyance executory are detailed, and in the present instrument we do not find comparable bases for qualification of the apparent general and immediate grant. The "power of attorney" before the court in Browne v. King, 111 Tex. 330, 235 S. W. 522, is set out (in its important parts) on page 885 of 196 Southwestern Reporter. The land to which its granting clause refers is the "land so recovered," i. e., to be recovered in user of the powers delegated. In each instance, it is noted: (a) Means of identification had as yet to be created; (b) that had to be done by the grantee in performance of service stipulated.

■ 2. Conclusion of error, in the reason assigned by the Court of Civil Appeals for reversal of the trial court's judgment and rendition of one for defendants in error, makes it necessary to determine what judgment should have been rendered. Texas Brewing Co. v. Templeman, 90 Tex. 277, 38 S. W. 27; Holland v. Nimitz, 111 Tex. 419, 232 S. W. 298, 239 S. W. 185.

September 9, 1878, Gibbons or his heirs had title to the entire tract now involved, and that title does not appear to have been transferred, unless through the bar of five or of ten years' prescription (articles 5509–5515, R. S. 1925) or to the extent effected by a suit brought by Gibbons' heirs September 3, 1890, against Damon (immediate vendee of Bennett et ux.) and by amendment at a later date against the Bennetts also, wherein they sought recovery of all the land. Prescription depends entirely upon possession, etc., by the Bennetts after September 9, 1878. They conveyed to Damon in 1889, but thereafter (for Damon) maintained possession. "Peaceableness" (article 5514) ended with filing of the suit on Septmber 3, 1890. Origination and completion of the bar (and transfer of title thereby, article 5513), if they happened, intervened September 9, 1878, and September 3, 1890.

Defendants in error presented in the Court of Civil Appeals lack of bases for prescriptive title.

The suit of Gibbons' heirs ended with an agreed judgment awarding Bennett 320 acres of the land now in question. The effect and the lack of effect of that award were the subjects of contentions made respectively by opposing parties in the Court of Civil Appeals.

Damon conveyed to Rogers, "trustee"; plaintiffs in error claim under Rogers' heirs. Defendants in error asserted in the Court of Civil Appeals lack of beneficial interest in Rogers and, sequently, in Rogers' heirs and their grantees.

Settlement of the questions thus suggested will determine what judgment should have been rendered.

■ 3. Predicate of asserted title by five years' prescribing is a tax deed executed Sep-

tember 9, 1878, by McGown, tax collector of Sabine county, to Bennett. In the deed are recitals: (a) "That whereas certain taxes are due the State of Texas upon 1118 acres of the J. W. Gibbons survey * * * as appears from the tax roll * * * for the year of 1877;" (b) of. levy, seizure, and advertisement of "said lands"; (c) of a "highest and best bid," in amount sufficient to pay taxes and costs, by Bennett, "for 1118 acres of said land"; (d) of conveyance to Bennett of "said land." The deed has a caption, "State of Texas, County of Sabine," with an acknowledgment taken at the county seat. The instrument does not include other means of identification (see article 4756, R. S. 1879; article 5185, R. S. 1895; article 7639, R. S. 1911; article 7281, R. S. 1925), such as certificate number, "name of the person * * * on whom demand for taxes was made" or the data shown in "the Tax roll * * * for the year of 1877," etc.

The "tax roll" or its data were not introduced in evidence.

In evidence it appears without contradiction: (a) Certificate No. 624 for 1,476 acres was issued to John W. Gibbons. May 17, 1838, a survey was made for Gibbons in Sabine county for "a part of the land to which he is entitled by virtue of certificate No. 624." The lines of that survey purported to include 1,024.9 acres. The "field notes" of that survey were "corrected" through a new survey made (by a different surveyor) in January, 1893, of a purported like quantum and upon the corrected "field notes" patent issued to heirs of Gibbons, February 2, 1893. Plats prepared by the two surveyors (which became a part of the "field notes" and of the record here) and the "field notes" disclose that boundaries of the two "surveys" are not exactly coincident. November 8, 1839, Gibbons transferred the certificate, except as to the acreage surveyed as shown above, to Norvell and Mitchell. March 15, 1848, 451.2 acres was patented, under the certificate and to the transferees. This acreage was shown on the official maps for Sabine county (compiled before 1877) as the "John W. Gibbons" survey, located a considerable distance (slightly south of east) from the acreage surveyed for Gibbons in 1838 (and again in 1893) and shown on the maps as the "John W. Gibbons" survey. (Platting of surveys and naming of same upon the maps appears to have been within authority of the compilers. Acts 1841, p. 150; article 5259, R. S. 1925.) No part of the smaller survey was in Bennett's possession, nor is the survey or any part of it now involved.

Against defendants in error we assume the tax deed does not include patent ambiguity voiding its asserted purport. But in our opinion, a voiding latent ambiguity is developed in the evidence, for it is impossible to ascertain, with any degree of certainty, to which, if either, of the John W. Gibbons surveys (separately considered) the description in the deed is referable, or to exclude from its reference the whole of the smaller survey and part of the other or parts of each. Since neither of the surveys, according to the records of the land office, contained 1,118 acres, it is likely that the "1118 acres" was made up (in tax records) of parts of the two surveys, or of the whole of one and part of the other.

■ The function of a deed under the five-year statute (article 5509) is to give notice to the owner of adverse claim "to the land." Roseborough v. Cook, 108 Tex. 364, 194 S. W. 131; Neal v. Pickett (Tex. Com. App.) 280 S. W. 748. Its imputation of that notice presupposes ability to apply with certainty its description to land in adverse possession (Kilpatrick v. Sisneros, 23 Tex. 136); and, if there be ambiguity preventing that application, it can make no difference that the vice is latent. This is indicated, we think, in Flanagan v. Boggess, 46 Tex. 331, wherein the court speaks of a description (not patently ambiguous) as sufficient "to satisfy the statute until there is evidence showing the contrary." The statement to be found in cases, that a "deed not void on its face will support the plea of five years' limitation," in its strict sense is too broad; there is no case within our reading wherein the doctrine was applied in the event of a fatal (though latent) ambiguity of description. See discussion in dissenting opinion in Schleicher v. Gatlin, 85 Tex. 270, 276, 20 S. W. 120. And there are many cases, e. g., Flanagan v. Boggess, supra, in which instruments containing general descriptions have been upheld as "deeds," because extrinsic evidence brought the land in controversy within the descriptive terms used.

Accordingly, the statute of five years' limitation (article 5509) does not aid the claims of plaintiffs in error.

■■ 4. The vice in the description in the tax deed precludes its "specification of boundaries" within meaning of the last clause of the ten-year statute (article 5510). But, even if the instrument could be regarded as a "memorandum of title" under that provision, it was not registered prior to May 1, 1882; accrual of prescription was ended, as noted, September 3, 1890; hence, the "deed" (thus regarded as a "memorandum") could not, in any event, extend Bennett's or Damon's claim to the "boundaries specified." Vergara v. Myers (Tex. Com. App.) 239 S. W. 944; Temple Lumber Co. v. Pulliam (Tex. Com. App.) 285 S. W. 609.

Less than 160 acres were "enclosed" at any time during Bennett's possession.

And, because of these things, claim under the ten-year period is restricted to 160 acres. Article 5510.

The evidence makes it clear that the "improvements" and "number of acres actually enclosed" were awarded Bennett in settlement of the suit of Gibbons' heirs, plus enough land to make up 320 acres in a tract

so located in the survey as to include any possible carving of 160 acres inclusive of "improvements," etc. Effect of that award (to be discussed) makes further consideration of the question of title by ten years' prescription immaterial.

■ 5. Bennett et ux., by deed of general warranty, undertook to convey all of the land now in dispute to Damon on December 23, 1889. Damon conveyed to Rogers, September 5, 1890.

The suit of Gibbons' heirs (brought against Damon, September 3, 1890, and by amendment against Damon and the Bennetts) was ended by agreed judgment February 10, 1894. Rogers had no part in the settlement, nor did Damon, unless and to the extent shown below. The judgment became final, and no attack by appeal or otherwise has been made upon it by any party thereto.

In that suit Gibbons' heirs sought recovery of all of the land theretofore claimed by the Bennetts and by them conveyed to Damon and by him to Rogers, and in the judgment all of the land, except 320 acres, was awarded to Gibbons' heirs; the 320 acres being awarded to Bennett as against Gibbons' heirs. In pleading, no issue was made as between Damon, on the one hand, and the Bennetts, on the other, and in the judgment no award as between them was undertaken.

In our opinion the title thus established in Bennett (whether in confirmation of previous title or in acquisition of new title) immediately passed, or was confirmed as having already passed, to Damon (and through him to his vendee) in virtue of the estoppel of previous conveyance and warranty of the Bennetts. Robinson v. Jacobs, 113 Tex. 231, 254 S. W. 309; 8 R. C. L. pp. 1058, 1062.

■ That did not occur, it is said by defendants in error, for that rescission as between Damon and the Bennetts took place incidental to the suit and judgment. Express agreement to that effect is not asserted; the claim rests in implication deducible on facts to be related.

The Bennetts had conveyed to Damon for a recited consideration of $256.22 cash, $256.22 (evidenced by note) to be paid December 23, 1890, and $256.22 (evidenced by note) payable December 23, 1891. Lien superior title, etc., was retained in the deed, and declared in the notes to secure payment of the deferred installments. The notes (executed to him as payee) were in Bennett's possession when the Gibbons' heirs brought suit and when the judgment was entered.

Goodrich was employed by Bennett to make defense in the suit; Goodrich associated Blount in the defense; answer was filed by them in behalf of the Bennetts and, purportedly, in behalf of Damon. Neither of these attorneys nor Bennett had any communication of any kind with Damon, or with any person supposed to be representing Damon, after the suit was filed, except as is disclosed in this testimony given by Goodrich:

"As I recall the facts now, though it has been some time ago, I was employed by Mr. Bennett and Mr. William Gellatly, who represented Mr. Bennett in the suit of the heirs of John W. Gibbons v. H. G. Damon et al., filed in the District Court of this county, involving the title to the John W. Gibbons survey of land in controversy. Mr. Bennett had been sued as one of the defendants in the case, and after a number of times—I don't recollect that with any definiteness—the matter was before the court here two or three or four times. W. W. Davis was here, and he had been here in this county at different times representing H. G. Damon in his land matters. I gathered from the remarks that he made, and that is all I can say—I don't know whether he represented H. G. Damon or not, but according to the remarks that he made, that was the impression that he left on me, that he was representing Mr. Damon, or looking after his interests in some way in the suit. At any rate, after the matter had been in the court for some time, he was in the company of Mr. Gellatly and C. M. Bennett down on that corner there, about the southwest corner of the square in the town of Hemphill, and they were engaged in some character of conversation; and I had a little office across the street from where they were, and as I came out on the porch of the little office Mr. Gellatly motioned to me to come over, and so I walked over there and in our conversation there was a remark made by Mr. Davis to the effect that there seemed to be nothing in it for them, and if they got anything out of it it was all right. In effect it was that it didn't look like there was anything in it for us; that was about his remarks, and if you—referring to Mr. Gellatly and Mr. Bennett—get anything out of it, it was all right. I can't recollect the exact words, but that was about the meaning of it. And in the discussion between Davis, Bennett and Gellatly there was a discussion about three notes. I was standing by, and taking no part in the conversation, but they were discussing something about the notes, and they remarked some way that the notes would be turned over to him—that is, to Davis—and Gellatly or Bennett, one or the other, remarked that they didn't have them there; and then Davis remarked that they could get them and turn them over to me and I could send them to him. So Bennett or Gellatly, one or the other, said that they would bring them the next morning, and they did bring the notes the next morning and gave them to me. That was rather early in the morning, and some time after that in the day Mr. Davis got aboard some kind of a vehicle that was going across here, to catch a train. I mean to say that the conversation I detailed occurred in the morning, yes sir. It was that

same day that Davis got a chance to go across on a vehicle that was going that way, to catch the train. That was about all the instructions I had with reference to the notes; they were to be sent to me.

"Well, they brought the notes the next morning,—either Mr. Gellatly or Mr. Bennett or both of them together, and gave them to me, and some time after that I sent the notes, as I recall now, with a letter addressed to Mr. Davis at Corsicana, and it was returned to me—he either didn't get them or something, but they were returned. They have been in my possession ever since until the last term of the court, and they were in the possession of the stenographer for a while and then he returned them to me.

"With regard to the entry of the judgment in the suit that they were discussing, well, the record speaks for that. Judgment was entered in that suit at another term of the court, in which the heir of Gibbons recovered all of the Gibbons survey except 320 acres, which was adjudged to C. M. Bennett and wife.

"Q. If there was anything said, state what it was, with reference to the further assertion of title by Damon under the deed that Bennett had previously made to him, in virtue of which those notes were given—with reference to what would be their further attitude, whether or not they were asserting or relinquishing title. A. Well, that is about all I can recollect. If they got anything out of it, it was all right, and it didn't seem like there was anything for them. If they could get anything out of it it was all right, if they got back their notes, and they would return the notes and things of that kind. The notes were to be returned to Davis for Damon. Now I don't know what was particularly said about that, at that time, but the notes that Damon had given in part payment for the land were to be turned back to him, and if Bennett could get anything out of the land he could go ahead. That is the way I understand it. I didn't participate in the conversation at all. I was standing there listening to what was said. And at a later term of the court there was a final judgment entered, which speaks for itself.

"Mr. Damon was not here at the time I have testified about this suit, that I know of. I didn't talk with him. I never did see him. I had no instructions from him directly, other than what I supposed were instructions through Mr. W. W. Davis. I had no correspondence with Mr. Damon about this suit, no sir, and I didn't see him personally about it. It is my recollection that I returned the notes that Mr. Bennett gave me, to Mr. Davis, and not to Damon. But they were sent to him for Damon; that was my instructions. They were returned to me for some reason. Davis did not return them, nor did Mr. Damon;

the letter was returned unclaimed, it was not delivered."

We treat the matter as having occurred exactly as detailed in the testimony just reproduced. Of the transaction thus detailed and upon assumption that agency of some kind in Davis is shown, it is justly observable that there is lack of evidence of authority to rescind in the manner claimed, with a presumption against existence of such power. Davis denied the fact of any such conversations as are detailed, and there is no testimonial suggestion that the transaction (assumed to have happened) was ever reported to, or came to the knowledge of, Damon at any time. The fact of judgment rendered and the nature of its terms do not suggest either existence of any such arrangement or of inquiry in respect thereto. The arrangement if made, as is manifest, was not beneficial to Damon, and this, with lack of knowledge on his part, precludes authority (in Davis) by estoppel.

The circumstance, that Bennett (inferably) never thereafter pressed collection of the notes, may be (and probably is) attributable to his knowledge that breach of his warranty had occurred in respect to most of the land covered by his deed.

Damon's failure to attack the judgment and his (implied) acceptance of its benefits may well be ascribed to his satisfaction with it, in view of knowledge (imputed) of passage to him (and his vendee) of the title there established or confirmed in Bennett, and in view of Bennett's failure to attempt collection of the notes.

We doubt that the evidence made rescission issuable; certainly it did no more, and in that situation decision of the trial court is final.

■ 6. It is a contention of defendants in error that Damon's conveyance to Rogers passed no beneficial interest, and, hence, plaintiffs in error acquired none from Rogers' heirs. The claim rests upon use of the word "trustee" immediately after Rogers' name in the granting clause and use of the words, "J. H. Rogers, trustee, his successors and assigns," in the habendum, etc.

The deed purports conveyance of all the lands in question and other lands in Sabine county for a recited cash consideration of $12,000, "paid by J. H. Rogers, trustee," with a covenant (or condition subsequent) that none of the lands should be used in manufacture, etc., of intoxicating liquors—this being stated as a part of the "consideration." It does not contain words indicating any character for a trust or suggesting identity of cestuis que. And the granting words are: "Has granted, sold and conveyed and do by these presents grant, sell and convey unto the said J. H. Rogers, trustee." The habendum is unrestricted in time or condition.

Recitals of consideration received by Damon are not disputed in pleading or proof, nor is there evidence to suggest that the $12,000 "paid" did not cover full value of the property conveyed.

It does not appear that Rogers ever owned or claimed to own any land or interest in land in Sabine county other than those covered in Damon's deed.

Damon's wife was an "heir" of Rogers, as such, and joined by her husband (Rogers' grantor), she executed the "power of attorney" under which the present suit was brought. And the rights of some of the defendants in error in respect to part of the land in the Gibbons survey (involved herein) were acquired from "one of the three sole surviving heirs of J. H. Rogers."

A question of notice imputed by use (in the deed) of the word "trustee," etc., is not involved, nor is there a question as to rights of undisclosed beneficiaries as against plaintiffs in error.

Prima facie the deed as a whole is not evidence of creation of a trust, for elements of certainty as to beneficiaries and purposes are lacking (26 R. C. L. pp. 1179–1185), and because of the broad construction to which a grantee is entitled in respect to the quality and quantum of estate. Nor do particular parts, separately considered, imply a trust: (a) Apparently full value was paid to grantor in "cash." (b) That sum was paid by grantee, and, if the funds were trust funds in the hands of Rogers, his grantor, apparently, was not a beneficial owner thereof, and who were such owners is not suggested. (c) Grantor detailed a stipulation against a certain use of the property; presumptively, this exhausted his intentions as to debasement, for he then remained silent. (d) Granting words used were appropriate to conveyance of fee simple, and the habendum is "forever."

There is in evidence no extrinsic fact or circumstance aiding the claim for a trust to be erected on the words used in the deed; such extrinsic evidence as there is (e. g., nonappearance of any person asserting â beneficial right; Damon's long silence, 1890–1911, and his joinder with his wife in stating her claim as an "heir" of Rogers) operates against the claim.

In our opinion, in the circumstances by which the deed is now conditioned, use of the words "trustee," etc., must be regarded as descriptio personæ. Cf., Sansom v. Ayer & Lord Tie Co., 144 Ky. 555, 139 S. W. 778.

 7. Attorneys ad litem were appointed to represent numerous defendants cited by publication. The same attorneys were appointed to represent certain infant defendants. In the judgment these attorneys were allowed the sum of $300 as compensation taxable as costs against all parties, and by another decretal plaintiffs in error were allowed a general recovery of all costs, inclusive of said $300. What interest, if any, various of the defendants cited by publication, and what interest, if any, the infant defendants ever had or claimed in the lands recovered by plaintiffs in error does not appear.

There is naught in the judgment to indicate what proportion of the compensation allowed was on account of services rendered in behalf of each of the various groups of defendants, or to indicate what ought have been allowed account of services thus allocated.

Defendants in error say those attorneys fees should have been taxed against plaintiffs in error, etc. Plaintiffs in error deny this, but offer to waive if there be error.

Some portion of the compensation, undoubtedly, ought have been taxed either against the infant defendants or against the plaintiffs in error. See Holloway v. McIlhenny, 77 Tex. 657, 14 S. W. 240; Pryor v. Krause (Tex. Civ. App.) 168 S. W. 498, 504, and cases there cited. And, probably, some portion as for services rendered in behalf of some of the adults cited by publication ought have been taxed against plaintiffs in error, since personal judgment against those defendants could not be rendered. Id.

We are of opinion, therefore, that allowance of costs in the manner shown is without support in the record.

8. Accordingly, we recommend: (1) That the judgment of the Court of Civil Appeals be reversed. (2) That the judgment of the district court be so reformed as to deny recovery to plaintiffs in error, James G. Barker and John Hancock, or either of them, of any part of, or interest in, the land involved in the suit (being the John W. Gibbons survey in Sabine county, patent No. ——, vol. No. 25, the patent to which is recorded at page 628 of volume 1 of the Deed Records of said county), except that certain 320 acres thereof described in the judgment rendered by the district court of Sabine county, Tex., on February 10, 1894, in cause No. 1196, styled "Heirs of John W. Gibbons v. H. G. Damon et al.," then pending in said court, which judgment is recorded at page 113 et seq., volume D of the Minutes of said court, and so as to allow said plaintiffs in error, jointly, recovery of an undivided one-fourth portion of, and interest in, the aforesaid 320 acres as against each and all of the other parties to the cause; and that the judgment of the district court be so reformed as to deny plaintiffs in error, James G. Barker and John Hancock, recovery of the sum of $300, allowed in said judgment as costs as for attorney's fees for representation of infant defendants and defendants cited by publication and as to tax said item of costs against said plaintiffs in error. (3) That the judgment of the district court be not otherwise disturbed, and as thus reformed it be affirmed.

CURETON, C. J. Judgment of the Court of Civil Appeals reversed, and judgment of the district court reformed, and, as reformed, affirmed, as recommended by the Commission of Appeals.