Charlie NEELEY and Earl
Gilbert, Appellant,

v.

INTERCITY MANAGEMENT CORPO-
RATION et al, Appellees.

No. 17967.

Court of Appeals of Texas,
Houston (1st Dist.).

Sept. 10, 1981.

Rehearing Denied Oct. 15, 1981.

John H. Miller, Jr., Sinton, R. David Legg, Legg & Hart, Houston, for appellant.

Thomas M. Andrews, Ellis, Andrews & Lawrence, Aransas Pass, William G. Burnett, Sinton, Larry Meyers, Brynes, Myers, Adair, Campbell & Sinex, Houston, for appellees.

Before COLEMAN, C. J., and PEDEN and SMITH, JJ.

PEDEN, Justice.

Charlie Neeley and Earl Gilbert appeal from a judgment, based on jury findings, awarding title to the working interest in certain oil, gas, and mineral leases to the plaintiffs, Intercity Management Corporation, John Phillips, George Fadler, Stanley Schlesinger, Arthur R. Taylor, John Schneider, Charles Ellis, and John Backe. The numerous leases at issue are located in the Welder E&F field (San Patricio County), the Slick-Wilcox field (Goliad and DeWitt Counties), and the Dyersdale field (Harris County). The appellants contend that the evidence was legally and factually insufficient to support the jury finding that they did not give valuable consideration for their assignments, that there was no evidence under any theory of recovery to support an award of the entire working interest to the appellees, that there was no jury finding and no conclusive proof that the corporate appellee (Intercity) had superior title out of the parties' common source, Driscoll Production Company, or that there was a valid trust in which the latter compa-

ny was trustee. One of the bases of the claim of the individual appellees is assignments from the common source of title, while the corporate appellee relies on the validity of the trust in question. The judgment is modified and, as modified, is affirmed.

Mr. Edward Driscoll, acting as president of Driscoll Production Company, was in the business of purchasing and developing oil and gas properties. He would acquire working interests in oil and gas leases, then would sell percentages of them to investors (among whom were the named party plaintiffs and their co-tenants) in return for capital needed to develop the leases. Typically, the investors would sign drilling contracts, lease-purchase agreements, or turnkey workover contracts with Driscoll for the various properties, whereby Driscoll would act as operator and, using funds provided by the investors, would drill test wells or rework unproductive wells. Upon successful completion of a producing property Driscoll Production was to give the investor an absolute assignment of the working interest purchased. In certain cases absolute assignments were made to investors from the outset, but not all of them were recorded. Once Driscoll had completed the agreed drilling and reworking then, in the event production resulted, Driscoll Production Company (DPC) and the investors each would bear a proportionate share of continuing production costs and would receive a proportionate share of the profits.

Driscoll was having marital problems during 1977. Mr. Paul Kratzig, an attorney who represented Driscoll on occasion, knew of these problems and of the unrecorded ownership interests which investors had purchased from DPC. To protect those interests from any claim against DPC by Driscoll's wife, Kratzig suggested that DPC execute and record assignments of the affected leaseholds to Driscoll Production Company, Trustee, (DPC, Trustee) to show that they were being held in trust for the investors. Consequently, on November 21, 1977, DPC assigned to Driscoll Production Company, Trustee, the following percentages of the leasehold estate and working interest in the leases at issue:

1) 98.6% of the Slick-Wilcox field Allen, Poetter, and Riedel leases

2) 98.66% of the Slick-Wilcox field Wood lease in Goliad County

3) 93.22916% of the Welder E&F field leases

4) 92.47393% of the Dyersdale field leases

These assignments were recorded on November 23 and 28 of 1977.

DPC apparently was having financial difficulties during this period, and in the spring of 1978 Kratzig, as Eddie Driscoll's representative, participated in a series of meetings and negotiations with the various working-interest owners. The negotiations appear to have culminated in a settlement agreement among Driscoll, DPC, and the investors whereby Driscoll pledged the properties to satisfy certain debts. This agreement was marked PX-120, but it was not admitted in evidence.

In addition, Driscoll called Mr. Charlie Neeley some time in May of 1978, seeking a loan of $100,000. Driscoll offered to mortgage his home, give Neeley oil leases, production runs, and equipment on the leases, if Neeley would make the loan. Neeley refused but called Earl Gilbert about it, and he and Driscoll went to Gilbert's office to see if something could be worked out.

James L. Hacker, senior vice president of Cullen Center Bank and Trust, testified that Neeley telephoned him on May 16, 1978, and asked him if he would make a $100,000 business loan to Neeley's friend, Driscoll. Neeley told him that Driscoll needed the money that day and said that the bank could have as collateral certain oil and gas properties owned by DPC and Tejano Development Company (Tejano). When Hacker told Neeley that it would take more than one day to check the titles on the properties and get together the legal paperwork for such a loan, Neeley said that he and Earl Gilbert would personally guarantee payment on it, an arrangement that was agreeable to Hacker. Later that day Driscoll signed the promissory note individually and on behalf of DPC and Tejano.

Neeley signed a guaranty for 50% of the outstanding indebtedness of DPC and Tejano, and Neeley signed a guaranty for the full amount due on the note. Gilbert did not join in the guaranty because some of the title documents were not as he had expected. After signing the original note in Houston, Driscoll went back to his Corpus Christi office to get signatures on the corporate resolutions Hacker had requested and to pick up some of the oil and gas assignments for Neeley. Hacker had told Neeley that the assignments were no good unless they were recorded, and the bank subsequently handled the recordings for Neeley. On May 22, 1978, Eddie Driscoll assigned to Neeley a life insurance policy in the face amount of $131,815 as collateral for all of Driscoll's indebtedness to Neeley.

Before the $100,000 note matured, Driscoll and DPC conveyed to Intercity any remaining interest that DPC had in the various leases in question here (since he had not paid the investors the funds due them from the producing properties) and in the fall of 1978, DPC, Trustee, conveyed to Intercity the interest previously received from DPC.

Driscoll died on October 5, 1978, and thereafter the court ordered the proceeds of the insurance policy paid to certain trustees, who placed them in a certificate of deposit worth $132,567 on November 8, 1979. The bank made demand on Neeley to pay the note he had guaranteed, and Neeley borrowed $104,896.51 in his own name for that purpose. When the note matured on December 14, Neeley signed a renewal note maturing March 14, 1979, and later again renewed the note, this time to mature June 12, 1979. When the original note was renewed, two things were added: 1) Earl Gilbert's guarantee for $50,524.48, and 2) a letter agreement dated December 14, 1978, in which Neeley agreed to use the life insurance proceeds assigned to him by Driscoll to pay off the note at some time in the future.

Subsequently, Neeley and Gilbert contacted the companies that were buying the oil and gas produced from certain of the subject leases, causing them to suspend payment of the proceeds to the individual investors and to Intercity, and this suit resulted. A partial summary judgment, granted on November 8, 1979, provided that Neeley recover $114,512.03 from the insurance proceeds that had been put into in the CD, plus $10\frac{3}{4}\%$ interest per annum from October 11, 1979, until maturity of the certificate, when the trustees in control of the proceeds were to pay such sums to Neeley.

In response to fifteen special issues submitted in the trial on the merits in this case, the jury found that 1) when Neeley and Gilbert obtained the assignments dated May 16, 1978, they did not have notice that the plaintiffs and their co-tenants were claiming an interest in the same properties by virtue of unrecorded lease purchase agreements from DPC, 2) Neeley and Gilbert did not pay a valuable consideration for their assignments from DPC, 3) the assignments to Neeley and Gilbert were intended as mortgages to secure the $100,000 note (this answer subsequently was disregarded by the court as conflicting with the answer to special issue 14), 4) on May 16, 1978, when it made the assignments to Neeley and Gilbert, DPC was indebted to all of the appellees but Intercity, 5) & 6) the jury did not find that the assignments to the defendants were intended to delay, hinder, or defraud any interested person from obtaining that to which he was entitled as a creditor of DPC, 8) the jury found that $1,136,540 was the fair market value of the subject properties at the time the assignments were made to the defendants, 9) the consideration paid by Neeley and Gilbert for their assignments was grossly inadequate in relation to the value of the property assigned, "grossly inadequate" being defined as a consideration which is intrinsically unfair under all of the circumstances, 10) & 11) Neeley and Gilbert wrongfully caused Permian Corporation and Houston Pipe Line Corporation to suspend payments to plaintiffs and their co-tenants for oil and gas produced from the Slick-Wilcox properties, 12) suspending payments for production from the Slick-Wilcox field disrupted Intercity's business operations, 13) $1,300,000 would reasonably com-

pensate Intercity in that regard (a remittitur was subsequently ordered on the basis of no evidence to support this answer), 14) DPC and Ed Driscoll intended to convey to Neeley and Gilbert 1.4% of the Slick-Wilcox properties, 7.5% of the Dyersdale properties, and 6.4% of the Welder E&F properties (this answer was subsequently disregarded as conflicting with the answer to special issue 3), and 15) the jury did not find that Neeley and Gilbert acquired the assignments to them in good faith, for a valuable consideration and without notice that the plaintiffs were claiming an interest in the same properties under unrecorded assignments.

Except as indicated above, the trial court rendered judgment based on the verdict and on the court's findings on issues reserved by stipulation of the parties. The judgment awarded to the plaintiffs title to and possession of the entire working interests in the leases at issue, ordered that the defendants pay damages of $1,300,000 to Intercity, and decreed that Neeley & Gilbert recover nothing from the plaintiffs on their cross-action. In response to the appellants' motion for new trial, the trial judge vacated the damages portion of the judgment and ordered a remittitur of the entire amount, and it was timely filed.

The appellants' first four points of error are that the trial court erred in awarding title and possession to the corporate appellee, Intercity, because Intercity did not conclusively prove or secure jury findings 1) that there was a valid trust in which DPC was trustee and that Intercity had title out of the common source (DPC) superior to that of the appellants as to the properties known as 2) Welder E & F, 3) Slick-Wilcox, and 4) Dyersdale.

The appellants point out that Intercity bases its claim of superior title out of the common source (DPC) on this sequence: the DPC assignments to DPC, Trustee, were recorded first; the appellants' assignments from DPC were recorded second; and the assignments from DPC, Trustee, to Intercity were executed last. The appellants say that under these facts, Intercity must prove that a valid trust existed between DPC and DPC, Trustee, before the assignments were made from DPC to the appellants and must prove that the conveyance in trust disposed of all the interest DPC had in the properties if the appellants are to show that later assignments from DPC to the appellants could pass no title. Further, they argue, since there were no jury findings that such a trust existed, the judgment cannot be sustained on that theory unless the appellees conclusively proved the existence of such a trust.

The appellants take the position that no written trust agreement complying with the provisions of the Texas Trust Act was offered in evidence and that the assignments to DPC, Trustee, did not create a trust. Article 7425b–7, Tex.Civ.Stat. (Vernon 1960), provides:

Requisites of a trust

An express trust may be created by one of the following means or methods:

A. A declaration in writing by the owner of the property that he holds it as trustee for another person, or persons, or for himself and another person or persons; or

B. A written transfer inter vivos by the owner of property to another person as trustee for the transferor or for a third person or persons; or

C. A transfer by will by the owner of property to another person or persons as trustee for a third person or persons; provided that a natural person as trustee may be a beneficiary of any such trust.

D. An appointment by a person having a power of appointment to another person as trustee for the donee of the power or for a third person; or

E. A promise by a person to another person whose rights thereunder are to be held in trust for a third person; or

F. A beneficiary may be a co-trustee and the legal and equitable title to the trust estate shall not merge by reason thereof. As amended Acts 1915, 49th Leg. p. 109, ch. 77 § 3.

Provided, however, that a *trust in relation to* or *consisting of real property shall*

*be invalid*, unless created, established, or declared:

 1. *By a written instrument subscribed by the trustor* or by his agent thereunto duly authorized by writing;

 2. By any other instrument under which the trustee claims the estate affected. (emphasis added)

The appellants argue that the assignments from DPC to DPC, Trustee were not "written instrument[s] subscribed by the trustor" within the meaning of the Act. In support of this position they rely upon two cases in which a reference to the grantee of a deed as "trustee" did not create a trust, but those cases are distinguishable from the case at bar.

In *Spiritas v. Robinowitz*, 544 S.W.2d 710, 713–715 (Tex.Civ.App.1976, writ ref'd n.r. e.), the parties had entered into a joint venture agreement between "Spiritas, Trustee" and "Robinowitz, Trustee" for the purpose of purchasing land known as the Tucker Tract. In the agreement the joint venturers were designated as trustees so that they could transfer part of their interest to third parties from time to time, yet could limit actual participation in the venture to themselves. The agreement provided that it would be governed by the Texas Uniform Partnership Act and that title to the property would be taken in the name of "Robinowitz, Trustee." Subsequently, title to the Tucker Tract was taken in the name of "Robinowitz, Trustee," and four months later title to a different tract was similarly taken. Robinowitz borrowed the purchase money for the second tract from the bank, securing his promissory note with a first lien on that tract and with a second lien on the Tucker Tract. The court held that no trust concerning the property had been created 1) because article 7425b–7 does not include a partnership agreement where one of the partners takes title to partnership property in his name as "trustee," and 2) because the joint venture agreement, in which "Robinowitz, Trustee" was one of the partners, did not show with certainty an intent to hold the title in trust for the venture, as distinguished from the partnership. The Dallas court then reasoned:

[The] designation ["Robinowitz, Trustee"] was made because the parties contemplated that Robinowitz would act for the benefit of certain employees to be named later. Since the venture agreement does not state that "Robinowitz, Trustee" was to take title in a capacity of trustee for the joint venture rather than as "Robinowitz, Trustee," one of the partners, we conclude that the agreement does not create an additional trust for the benefit of the venture. On the contrary, the agreement provides that the relationship of the parties is to be governed by the Texas Uniform Partnership Act. We cannot impose a trust where parties have contemplated another relationship. G. Bogert, Trusts & Trustees, § 45 at 316 (2d ed. 1965). Thus, the use of "trustee" in the deed is merely a description and without legal effect. It is as if title were in Robinowitz individually. *Barker v. Temple Lumber Co.*, 12 S.W.2d 175, 180 (Tex. Com.App.1929), *rev'd on other grounds*, 120 Tex. 244, 37 S.W.2d 721 (1931); *Annot.* 137 A.L.R. 460, 462–65 (1942). We conclude that the Texas Blind Trust Act has no application here, and that article 6132b, § 10(3) of the Texas Uniform Partnership Act, Tex.Rev.Civ.Stat.Ann. art. 6132b (Vernon 1970) governs. . . .

In *Robinowitz*, the evidence was undisputed that Spiritas had no interest in the second tract, and the jury found that Robinowitz did not intend for the joint venture to have an interest in it. Clearly, the facts in our case are distinguishable; in it the evidence is uncontested that the investors paid the consideration recited in their assignments or contracts to assign, and the relationship is not comparable to the trustee-as-partner designation.

 In stating that "[d]esignation of a party as 'trustee' does not in itself create a trust," the *Robinowitz* court relied on its 1964 holding in *Costello v. Hillcrest State Bank*, 380 S.W.2d 780, 782 (Tex.Civ.App., no writ), and on the 1929 Commission of Appeals case of *Barker v. Temple Lumber Co.*, 12 S.W.2d 175, 180, *rev'd on other grounds*, 120 Tex. 244, 37 S.W.2d 721 (1931).

The *Costello* case involved the appeal of an order denying a temporary injunction to restrain a foreclosure sale on an alleged homestead. The property had been purchased during marriage with funds acquired during marriage, and both the husband and wife specifically testified that a trust never had existed; moreover, the wife testified that she was unaware that title had been taken in the name of "Jim Costello, Trustee." The bank relied on Art. 7425b–8 of the Texas Trust Act, to support its contention that the deed to Jim Costello, Trustee, the beneficiaries not being disclosed, did not convey a title upon which homestead rights may be impressed. Citing 19 Tex.Jur.2d *Deeds* § 62, at 333 (1960), and 26A C.J.S. *Descriptio Personae* at 859 (1956), the *Costello* court stated that mere use of the word "trustee" does not of itself create a trust. The C.J.S. section relied upon states that a word or phrase used merely to identify or point out the person intended and not as an intimation that the language in connection with which it occurs is to apply to him only in the technical character which might appear to be indicated by the word, is *descriptio personae.*

■ In our case DPC assigned the property to DPC, Trustee; a situation in which A conveys to B, trustee, is not the same as a situation in which A conveys to A, trustee. While the former example is susceptible to construction as *descriptio personae*, the latter is less so. In the absence of evidence tending to show that no trust was intended, it is illogical to assume that A would convey to A, trustee, if his intent merely was to retain the title he already possessed. Moreover, when the grantor and grantee are the same entity except for use of the word describing the grantee's capacity, it is not reasonable to say that the descriptive word was used merely to identify or point out the person intended. It is proper to consider the circumstances surrounding the execution of the deed in determining whether the word "trustee" must be regarded as *descriptio personae. See Barker v. Temple Lumber Co., supra.*

The appellees' position is that there was a valid trust established in favor of the appellants and their co-tenants by virtue of two uncontested series of facts in the record:

1. The lease purchase agreements in evidence and the payment by investors of the required funds created an obligation on DPC to deliver title documents to the investors, but such documents had not been delivered;

2. On November 21, 1977, after the investors had paid the consideration called for in the lease purchase agreements, the drilling contracts, and the turnkey contracts for reworking, DPC conveyed to DPC, Trustee, assignments in recognition of the investors' purchased interests.

Paul Kratzig, the attorney who represented Mr. Driscoll on occasion, testified to the numerous lease-purchase agreements, drilling contracts, and reworking contracts between DPC and the appellees. He also testified that DPC made, executed, and delivered three deeds covering the subject property to DPC, Trustee for the purpose of protecting the title of any investor whose interest previously had been paid for but may not have been recorded. These three conveyances were recorded before the execution of the assignment of the same properties to the appellants. The appellees say that since a blind trust can be validly created under Article 7425a, and since a trust can be created by two instruments, one containing the assignment to the trustee and the other expressing the existence of the trust, that all of Driscoll's interest was effectively placed in trust with DPC as trustee. They reason that DPC, not acting as trustee, had nothing remaining to convey to the appellants. We hold that the legal test for existence of a trust was met by 1) the Kratzig testimony concerning Driscoll's purpose in making the deeds to DPC, Trustee, 2) the numerous investor agreements mentioned above, 3) payment by the investors of the consideration called for in such agreements, 4) the actual conveyance of the subject property to a named trustee, and 5) the fact that DPC was an operating company for the benefit of the various investors.

Intercity subsequently received conveyance from DPC, Trustee, of 98.6% of the Slick-Wilcox leases, 93.6% of the Welder E&F leases, and 92.5% of the Dyersdale leases. Since the assignments to the trustee had been recorded before the assignments to the appellants, and a valid trust had been created, the appellants were on constructive notice as to the outstanding prior claims. *See generally Gulf Production Co. v. Continental Oil Co.*, 139 Tex. 183, 132 S.W.2d 553, 568 (1929); superseded, 139 Tex. 183, 164 S.W.2d 488 (1942).

■ When Driscoll executed the assignments and contracts to assign to the investors and when DPC went into possession on their behalf and proceeded to develop the leases, this and the fact that they had paid their consideration established the existence of a valid trust. DPC's subsequent assignments of the properties to a named trustee, DPC, Trustee, confirmed his intent; insofar as the assignments to the appellants covered the property previously assigned by DPC to DPC, Trustee, those assignments to the appellants passed no title. We hold that the trial court was entitled to make these conclusions from the uncontroverted evidence, and we presume, in support of the judgment that they were made. We overrule the first four points of error.

In points of error 5–13 the appellants say that the trial court erred in awarding to the appellees the entire working interest in the subject properties: 1) because the appellants are not trespassers but are the appellees' co-tenants, inasmuch as the evidence conclusively established that Gilbert and Neeley were the owners of at least i) 5.45% of the working interest in the Welder E&F field leases, ii) 100% of the working interest in the Slick-Wilcox field Wood lease in Goliad County and 26.4% of the working interest in the Slick-Wilcox field Allen, Poetter, and Riedell leases, and iii) as to the Dyersdale properties, 25.52084% of the working interest in the Houston Suburban Heights Subdivision leases, and 20.05209% of the working interest in the Burkitt leases, and 2) because the individual appellees did not prove that they had superior title out of the common source to the working interest in the subject properties. They rely upon the general rule set out in *Duncanson v. Howell*, 222 S.W. 232, 235 (Tex.Com.App.1920), and *Dahlberg v. Holden*, 150 Tex. 179, 238 S.W.2d 699, 703 (1951), that a plaintiff demonstrating only some unspecified undivided interest can recover the entire tract as against a trespasser, but not against a cotenant.

The Supreme Court approved the holding of the Commission of Appeals in the *Duncanson* case, which stated:

Plaintiffs had title to an undivided interest. This would be sufficient to warrant a recovery of the entire tract as against a trespasser. This right does not, of course, exist as against a cotenant. The judgment was evidently based upon the conception that plaintiffs were trustees for all of the shareholders. Under the evidence no such relation exists. The legal title remained in Hust & Brundage; the equitable title passing to the shareholders. The commission appointed by the shareholders, though called trustees, were in fact mere agents, not vested with the title of any of the shareholders. It is in this right that plaintiffs sought recovery of all of the lands .... the full extent of plaintiffs' right was to have their interests adjudicated, and be admitted into joint possession of the land with defendant. (citations omitted)

ln *Dahlberg v. Holden, supra*, the respondents had alleged in their pleading that they owned the premises in question in fee simple and had proved that the land had been conveyed to their mother and her two sisters by a deed which did not specify the interest conveyed. The Supreme Court held that the mother and her two sisters were each owners of an undivided one-third interest as a matter of law and awarded the entire tract to the respondents on that basis. On rehearing, the court modified the original judgment, which had affirmed the award of the entire tract to respondents, so that respondents instead would recover only an undivided one-third. The issue of title to the remaining ⅔ interest was remanded,

being clearly severable, on the basis that as to it the record was not fully developed.

■ Citing Rule 279, Tex.R.Civ.P., the appellants in our case argue that an award of the entire working interest to the appellees would be legally insupportable unless the evidence had established conclusively that the appellants were trespassers or unless the plaintiffs-appellees had secured a jury finding to that effect. In pertinent part Rule 279 provides:

Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and upon which no issue is given or requested shall be deemed as waived; but where such ground of recovery or of defense consists of more than one issue, if one or more of the issues necessary to sustain such ground of recovery or of defense, and necessarily referable thereto, are submitted to and answered by the jury, and one or more of such issues are omitted, without such request, or objection, and there is evidence to support a finding thereon ... such omitted issue or issues shall be deemed as found by the court in such manner as to support the judgment.

The validity of this argument rests on whether the trial court could only have awarded the entire working interest to the appellees on the theory that the appellants were trespassers, that the trespasser theory is an independent ground of recovery, and that no issue necessary to sustain it and necessarily referable thereto was submitted. We agree that the appellees are not entitled to prevail on the theory that the appellants were trespassers.

The appellees say that there are four theories under which they could have been awarded the entire working interest without proving that the defendants were trespassers and that the evidence establishes their title under each. The theories they urge are 1) that the appellants' assignments granted nothing more than a security interest in the leases and the security interest has been paid in full, 2) that the appellants received nothing more than quitclaims and could not recover more than their grantor

owned, 3) that the appellants were not innocent purchasers for value without notice, and 4) that in addition to having perfected a prior superior title from the common source, certain of the appellees' co-tenants had perfected legal title from an equitable title. We do not agree with their position.

The trial court granted the appellants' motion to disregard the jury's answers to special issues 3 and 14 on the basis that they were in conflict, since the assignments to the defendants could not be both mortgages and conveyances. Apparently the trial court's judgment was not based on the theory that the assignments to Neeley and Gilbert granted them mere mortgages, since the jury's answer to that issue was disregarded; under the conflicting evidence in this case, we cannot hold as a matter of law that the appellants' assignments amounted to nothing more than mortgages. The appellees have not filed cross-points complaining of the trial court's having disregarded the jury's finding that the assignments to the appellants were intended as mortgages. The trial court refused to rule on whether the assignments to Neeley and Gilbert were quitclaims, stating that it was possible to enter judgment without such a ruling. We agree with the appellants' position that even if their assignments were quitclaims, the appellees were only entitled to have their interests adjudicated and to be admitted into joint possession of the properties with the appellants.

■ Basing the trial court's judgment on the theory that the appellants failed to get a finding that they were good faith purchasers for value without notice and thus could not defeat the appellees' equitable title, the question becomes whether or not that equitable title extended to the whole tract. We have held that the conveyances from DPC to DPC, Trustee, were valid trusts, and we consider that the plaintiffs proved superior equitable title to the percentages (discussed earlier) of the working interest conveyed by DPC, Trustee, for the properties at issue. This is so because an equitable title is an enforceable right to have legal title transferred to the holder of

the equity. *Johnson v. Wood*, 138 Tex. 106, 157 S.W.2d 146 (1941). With respect to bona fide purchasers for value without notice, the word "title" refers to the vendor's evidence of rights and not to what may be the real beneficial interest demonstrated by extrinsic proof outside of such evidence, *Patty v. Middleton*, 82 Tex. 586, 17 S.W. 909 (1891), and a plaintiff in a trespass to try title suit may recover on the strength of an equitable title as well as a legal one. *Johnson v. Wood, supra; Herrington v. Williams*, 31 Tex. 448, 460–61 (1868). Notwithstanding the foregoing, an innocent purchaser for value of the legal title will prevail over the holder of a prior equitable title, *Burnham v. Hardy Oil Co.*, 108 Tex. 555, 195 S.W. 1139, 1141 (1917), since it is the policy of our laws and recording statutes to protect purchasers against secret titles, whether they be legal or equitable. *Edwards v. Brown*, 68 Tex. 329, 331–32, 4 S.W. 380, 381 (1887). The word "assign" is tantamount to the word "grant", which is an operative word of conveyance. *Harlowe v. Hudgins*, 84 Tex. 107, 19 S.W. 364, 365 (1892). Ownership of the equitable estate is the real ownership, and the legal estate is no more than the "shadow following the equitable estate," which is the substance, except where there is a purchaser for value and without notice who has acquired the legal estate. *Patty v. Middleton, supra.* The equitable title claimant has the burden of proving that the subsequent purchaser of legal title is not a bona fide purchaser for value without notice. *Delay v. Truitt*, 182 S.W. 732, 735 (Tex.Civ.App.1916, writ ref'd). A mere equitable right rises to the dignity of an equitable title when performance under the particular contract occurs, such as payment of purchase money. *Johnson v. Wood, supra.*

In *Humble Oil & Refining Co. v. Blankenburg*, 149 Tex. 498, 235 S.W.2d 891, 895–96 (1951), the petitioner was awarded the entire title to the property in controversy on the basis that it had established 1) its beneficial ownership of a definite undivided interest in the property by proof of its ownership of 90 shares of the stock of the Franklin Development Company, and 2) that respondents were strangers to the title, since they claimed through leases creating only a public easement and not conveying any right, title, or interest in the property in issue. The court stated the rule that the owner of an undivided interest may recover the entire tract in a trespass to try title suit, providing that the above two conditions are met.

In *Steddum v. Kirby Lumber Co.*, 110 Tex. 513, 221 S.W. 920, 922 (1920), the Texas Commission of Appeals wrote:

Since the decision of *Croft v. Rains*, 10 Tex. 520, it has been held that a tenant in common could recover in trespass to try title the entire premises as against a stranger to the title or trespasser. *Watrous' Heirs v. McGrew*, 16 Tex. 511; *Grassmeyer v. Beeson*, 18 Tex. 766, 70 Am.Dec. 309; *May v. Slade*, 24 Tex. 207; *Biencourt v. Parker*, 27 Tex. 564; *Hutchins v. Bacon*, 46 Tex. 414; *Guilford v. Love*, 49 Tex. 718; *Stovall v. Carmichael*, 52 Tex. 389; *Pilcher v. Kirk*, 55 Tex. 215.

. . . .

These cases all proceed upon the theory that a tenant in common is entitled to possession of the entire premises against all persons except the other tenants in common, and that a stranger to the title, or trespasser, cannot defeat a recovery by showing an outstanding title to some interest in the land in one not a party to the suit.

If it appears that the defendant is the owner of an interest in the land, this rule has no application, and in such case the plaintiff can recover only to the extent of his interest, and it necessarily follows that the plaintiff must show the extent of such interest. The effect of these decisions is, we think, to hold that *the plaintiff,* when he has shown a title to an undivided interest, is entitled to a judgment for the entire tract, or at least for the interest sued for, unless the defendant shall show title to some interest in the land, or the right to the possession thereof.

In approving the judgment of the Commission of Appeals, the Supreme Court wrote 221 S.W. at page 924:

The Court of Civil Appeals . . . correctly held that it is incumbent upon a plaintiff suing in trespass to try title for an undivided interest in land to establish his title to a definite interest, whether it be the whole interest for which he sues or a less interest; and that he is not entitled to recover the exclusive possession of the land unless he establishes not only his own title to an undivided interest, but also that the defendant has no title to any interest. Such is the holding on the first proposition in *Baldwin v. Goldfrank*, 88 Tex. 249, 31 S.W. 1064, and on the other in *Davidson v. Wallingford*, 88 Tex. 619, 32 S.W. 1030 . . . .

Neither of these decisions in any way contravenes the rule many times announced by the court, that as against a trespasser one tenant in common may recover the possession of the entire tract, and this, though he only claims in his petition and establishes title to an interest less than the whole. The reason . . . is that . . . he is entitled to the possession against everybody except his co-tenants, [and] he is necessarily entitled to the exclusive possession against a trespasser.

Even though the plaintiffs proved superior equitable title to 98.6% and 98.66%, respectively, of the two sets of leases at issue in the Slick-Wilcox field, 93.22916% of the Welder E&F leases, and 92.47393% of the Dyersdale field leases, instead of the percentages urged by the appellants, there remains an outstanding percentage of the working interest in each of those fields to which they did not establish superior title. We sustain points of error 5–13 only to the extent that we hold that the plaintiffs (appellees) failed to establish their superior title. The remaining percentages would be those which the appellees' counsel told the jury that the appellants were entitled to:

| | |
|---|---|
| 1.4% | of the Allen, Poetter, and Riedel leases in the Slick-Wilcox field. |
| 1.34% | of the Wood lease in the Slick-Wilcox Field. |
| 6.77084% | of the Welder E & F field leases. |
| 7.52607% | of the Dyersdale field leases. |

In points of error 14 and 15 the appellants complain of the trial court's having overruled these objections to Special Issue 15 in the trial court's charge:

A. The special issue incorrectly defines the term "valuable consideration" by failing to inform the jury that a valuable consideration need not be full and adequate consideration.

B. The special issue incorrectly defines the term "valuable consideration" by stating that a valuable consideration must be a consideration bearing some relation to the value of the property when, to be a valuable consideration, it need not bear any relation to the value of the property.

The instruction given by the trial court was:

In connection with the above and foregoing Special Issue, you are instructed that the term "valuable consideration" as used herein means a consideration of some value. It means something more than nominal consideration and must be a consideration bearing some relation to the value of the property described in the assignment dated May 16, 1978.

 We overrule these points. We cannot say the trial court committed reversible error by refusing requested instruction A. Rule 434, Tex.R.Civ.P. As to requested instruction B, one who pays a grossly inadequate consideration for property cannot be an innocent purchaser for value, *Hume v. Ware*, 87 Tex. 380, 28 S.W. 935 (1894), so the trial court did not err in declining to instruct the jury that "to be a valuable consideration, it need not bear any relation to the value of the property."

The appellants contend in points 16–19, inclusive, that the evidence is legally and factually insufficient to support the jury's findings, in response to issues 2 and 9, that they did not pay a valuable consideration for their assignments and that such consideration was grossly inadequate. To answer these issues the jurors were required to compare the consideration given with the value of the property described in the assignments.

In order for the appellants to establish title superior to the equitable title claimed by the appellees under the unrecorded instruments it was necessary for them to be bona fide purchasers for value without notice of the appellees' claim. This is so because the recordation statutes would protect such a purchaser under the facts in our case. While a court of law normally will not inquire into the adequacy of consideration, in its equitable role a court may inquire when there is such a gross disparity in the relative values exchanged as to show unconscionability or when an inadequate price is coupled with inequitable incidents showing bad faith, such as undue advantage or pecuniary necessity. *See Wells v. Houston*, 23 Tex.Civ.App. 629, 57 S.W. 584, 593 (1900, no writ). The appellees in our case argue that since inadequate price was pleaded and since evidence was admitted to raise the issues of pecuniary necessity, distress, and undue advantage, the appellants had the burden of establishing their good faith. As already noted, the equitable claimant has the burden of showing that a subsequent purchaser of legal title was not a bona fide purchaser for value without notice. *Delay v. Truitt, supra.* It would seem that the appellees met that burden, in any event, if there is more than a scintilla of evidence to support the jury's findings of inadequate consideration.

The appellants' primary argument under these points is that although there is evidence that the value of the working interest in the three fields was $1,136,540 at the time of trial, the percentages of ownership claimed by the appellees varied significantly among the several properties and that there is no evidence of the individual values of the three properties. This, the appellants say, is fatal to the findings of inadequate consideration which made it impossible for them to be good faith purchasers for value. In reviewing no evidence points we look only to the evidence and inferences favorable to the verdict and jury findings and disregard all contrary evidence and inferences. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); *Mobil Pipeline Co. v. Goodwin*, 492 S.W.2d 608, 611 (Tex.Civ.App.

1972, writ ref'd n. r. e.). In reviewing factual insufficiency points, we look to all the evidence.

We have noted that in April or May of 1978 Edward Driscoll, president of DPC, discussed with Charlie Neeley the borrowing of $100,000 for the company. Subsequently, a loan in that amount was made by Cullen Center Bank, and repayment was guaranteed by Neeley; Gilbert joined as a guarantor of the loan on December 14, 1978, more than two months after Driscoll's death. In consideration for the loan guarantee Driscoll executed the assignments under which the appellants now claim and also assigned to Gilbert and Neeley an interest in an insurance policy on Driscoll's life sufficient to repay the loan in the event of his death; the appellants subsequently received the proceeds from that policy. The assignments purport to convey to the appellants "all ... right title and interest" of Driscoll Production Company and Edward Driscoll in the attached property descriptions of the three fields. The appellants argue under their points of error attacking the award to the appellees of the entire working interest in all properties that when the assignments were made the grantor retained at least 5.45% of the working interest in the Welder E&F leases, all of the working interest in one of the Slick-Wilcox leases and 26.4% of the working interest in another three of those, 25.52084% of the working interest in one of the Dyersdale leases and 20.0529% of the working interest in another lease from that group.

Plaintiffs' witness Don Bodine, comptroller of Intercity Management at the time of trial and Comptroller for Driscoll Production prior to June of 1978, testified that Driscoll Production received a total of $858,000 from investors for their interests in the Slick-Wilcox field, $670,413 for the Welder E&F, and $377,449 for the Dyersdale field. The amount of net income available for distribution to investors after paying costs and burdens is set forth in plaintiffs' exhibits, and there was testimony by the investors and documentary evidence (the drilling contracts, lease-purchase

agreements, and turnkey reworking contracts) showing the amounts the investor-appellees paid for their proportionate shares. Charlie Neeley testified that one of the Dyersdale wells was producing $1,900 worth of gas per day, and the parties stipulated to the various sums on deposit in the registry of the court. We hold that the evidence was both legally and factually sufficient to support the jury's answers to Special Issues 2 and 9. It was not necessary for the jury to compute a precise value in order to decide that the relative value of the appellants' guaranty was grossly disproportionate to the assignments and other collateral received.

The appellants' point 20 complains of the trial court's having given the jury a definition of the term "valuable consideration" in connection with Special Issue 15 that included: "but which must bear some relation to the value of the property." We overrule this point for the same reason we overruled point of error 15.

Finding no basis for holding that the trial court erred in denying the appellants' motions for mistrial, we overrule their points 21 and 22.

Points of error 25–33 are urged by the appellants only to the extent that the judgment of the trial court might be construed as being based on theories of limitations, prior possession, or superior title from the sovereign. We do not consider that the judgment could be supported on either of those theories, so we need not rule on points 25–33.

We modify the trial court's judgment to provide that title and possession of the working interest awarded to the appellees be reduced to 98.6% of the Allen, Poetter, and Riedell leases in the Slick-Wilcox field, 98.66% of the Wood lease in the Slick-Wilcox field, 93.22916% of the Welder E&F field leases, and 92.47393% of the Dyersdale field leases.

As so modified, the judgment of the trial court is affirmed.