Larry N. ALLEN and Etoile S. Allen, Appellants,

v.

NATIONAL BANK OF CONROE, Appellee.

No. 09–93–273 CV.

Court of Appeals of Texas, Beaumont.

Submitted Sept. 22, 1994.

Decided Oct. 13, 1994.

C.E. Clover, Jr., Sealy, for appellants.

Preston C. Goodwin, Goodwin & Harrison, The Woodlands, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

Appeal from the granting of a summary judgment adverse to the Allens and favorable to the plaintiff below, National Bank of Conroe (Bank). The summary judgment for the plaintiff Bank was granted in a suit based on four promissory notes.

The Bank brought this suit on three promissory notes made by Larry N. and Etoile S. Allen, appellants (Allens). A fourth promissory note was made and signed by Larry only. In granting the Bank's motion for summary judgment, the trial court entered a judgment for the Bank and against the Allens on three notes in the amounts of $260.74, $1,025.75, and $30,977.51.

A separate, decretal part of the judgment in favor of the Bank was against Larry Allen

only on one note in the principal amount of $42,762.06. The Bank also recovered interest, attorneys' fees, and court costs.

■ The Allens' first point of error, in substance, argues that the trial court erred in granting the Bank's motion for summary judgment because there are genuine issues of material facts raised within the pleadings and by the summary judgment proof and evidence which could not be disposed of by summary judgment proceedings, but actually require determination by a factfinder after trial on the merits.

■ At the threshold, we acknowledge the well-established standard of review in an appeal challenging a summary judgment. A comprehensive and inclusive statement of the standards of review as applicable here is set out clearly in *Nixon v. Mr. Property Management*, 690 S.W.2d 546 (Tex.1985). We quote from *Nixon*:

1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.

2. In deciding whether or not there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true; and

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in his favor.

*Id.*, at 548–549; *Turboff v. Gertner, Aron & Ledet, Inv.*, 763 S.W.2d 827, 829 (Tex.App.—Houston [14th Dist.] 1988, writ denied). Moreover, the usual presumption that the judgment is correct does not apply. *See Montgomery v. Kennedy*, 669 S.W.2d 309, 311 (Tex.1984); *Great American R. Ins. Co. v. San Antonio Pl. Sup. Co.*, 391 S.W.2d 41, 47 (Tex.1965).

■ Justice Doggett speaking and writing for an unanimous Supreme Court of Texas in *Acker v. Texas Water Com'n*, 790 S.W.2d 299, 302 (Tex.1990), wrote and held as follows:

In the review of a summary judgment, the movant has the burden of showing that there is no genuine issue of material fact

and that it is entitled to judgment as a matter of law. Evidence favorable to the non-movant will be taken as true when deciding whether a material fact issue exists. All reasonable inferences must be indulged in favor of the non-movant and any doubts resolved in its favor. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

Notable and significant is the salient requirement that any and all doubts must be resolved in favor of the non-movants, the Allens.

■ An intermediate appellate court must take the summary judgment proof of the non-movants as true and correct. A somewhat lengthy affidavit of Larry is in the record. There are numerous exhibits attached thereto. In brief summary, the affidavit demonstrated for the purpose of this appeal—under the accepted rules of review—that Larry and Etoile had executed a promissory note on or about December 30, 1986, in the amount of $350,000 to the Bank. This first note represented purchase money of a homestead located in the Rancho Escondido, Section two, subdivision of Montgomery County.

Later in the extreme latter part of December 1989, Larry and Etoile executed and delivered a renewal and extension of the real estate note and lien whereby the original $350,000 note was renewed and extended. Ad valorem taxes became due for the tax years of 1989 and 1990 in the approximate amount of $25,000.

Larry contacted the Bank and requested an additional loan to pay the delinquent taxes. The Allens at that time had a buyer for the property. The purchase price would have been sufficient to pay off the first lien note as well as the additional loan for the delinquent taxes. The bankers told the Allens, at least Larry, that the Bank, in its opinion, did not need to make any additional loan.

Shortly after this pronouncement from the Bank officers, Larry was advised by his own realtor that the locks on the property had been changed and that someone had bought the property at a foreclosure sale. Larry

tried to contact Mr. Sauer, the Bank's president, and Mr. Nelson, a loan officer. Larry swears Mr. Nelson indicated that he knew about the foreclosure and that the Bank was preparing loan papers for the purpose of loaning to Larry and his wife the necessary funds to redeem the property and further, that the Bank had spoken to the buyer of the property. The banker indicated that as a result of the foreclosure proceedings there were additional penalties, interest and attorneys' fees which added approximately 25 percent to the original sum of approximately $25,000 for the delinquent ad valorem taxes.

Larry stoutly maintains that the Bank had caused the additional penalties, interest, and attorneys' fees. Mr. Nelson acknowledged this fact and represented to Larry that the Bank would either actually absorb the additional cost itself or would work it out in the settlement of the property upon its sale.

Then about December 6, 1991, the Allens executed another real estate lien note in the original principal amount of $36,000, payable to the Bank. This loan was for the purpose of redeeming the property. Shortly after the execution of the $36,000 note, it was learned that the buyer of the property at the foreclosure sale had also, in addition, paid the new, current taxes in the approximate amount of $9,000. This new $9,000 payment for ad valorem taxes was in addition to the $25,000.

Then, according to Larry's sworn testimony—which we must accept as true—Mr. Nelson called Larry and told Larry that the property could not be properly redeemed unless the new, current taxes which had been paid by the buyer were also repaid or reimbursed by the Allens. Larry was advised that the Bank had convened a special board meeting and authorized yet another loan (as we interpret the affidavit) in the amount of $9,996.87 for the purpose of paying the new, current taxes. The new, current taxes were presumably for the year after 1990. Then, on December 17, 1991, the Allens executed a real estate lien note in the original principal amount of $9,996.87 payable to the Bank.

The plot thickened and became more complicated because in December of 1991 the Allens received a notice from the Internal Revenue Service (IRS) that the IRS had placed a lien against the property in the approximate amount of $41,000. At that point, the Allens had an earnest money contract to sell the property and the Bank knew the identity of the buyers.

The Bank then agreed to provide 100 percent financing for the purchase price to the buyers. The First Surety Title Company acted as escrow and closing agent. The Title Company indicated that it would not close the purchase and sale the property pursuant to the earnest money contract without the full release of the IRS lien. Although Larry stoutly protested the $41,000 lien, it later grew into an amount in excess of $47,000. Larry believed that the IRS lien would be reduced by an amount of $27,000. Larry swore that Mr. Sauer proposed and agreed that the Bank would lend Larry the additional funds necessary to close the entire transaction and to cover the outstanding IRS lien. In return for Larry's cooperation the Bank would execute an agreement that Larry's liability would not exceed $27,488 plus interest.

Then on April 10, 1992, Larry executed another original principal note in the amount of $41,818 payable to the Bank. In addition to the above summary judgment evidence, there exists a letter from the Bank signed by Boyd L. Nelson, Senior Vice President, to Mr. and Mrs. Allen in reference to a certain note. The letter is dated April 10, 1992. In substance this letter from Mr. Nelson stated that in exchange for the above referenced note the Bank hereby agreed that the maximum dollar amount of the loan to be collected and repaid by the Allens would be $27,488.00 plus interest. Nelson wrote that the Allens' liability to this Bank would be fully released when the said $27,488 plus interest was paid. The Allens were to agree to assign any and all funds paid by the Bank in behalf of the Allens to the First Surety Title Company. Apparently, any excess escrow funds were to be paid back to the Bank to be credited in behalf of the Allens on the note. The Allens were to receive no excess escrow funds.

But on the same date, April 10, 1992, there was another letter to the Allens setting out the principal, accrued interest, and per diem interest on the first three loans on the property in Rancho Escondido. The principal due was $389,496.03. The accrued interest through 4/10/92 was $31,828.41 and the per diem interest was running at the rate of $108.89 per day.

On April 10th, Larry and Etoile sold the property to a married couple by the name of Suttle. A copy of the settlement statement reveals that there was a payoff of the first mortgage to the Bank in the amount of $390,-000. Accordingly, Larry contends, the first original three notes had been paid in full as a part of the closing of the sale of the subject property and the same was clearly reflected by the settlement statement. Larry contends the three notes were marked "PAID".

The record, properly before us, is glaringly clear in proving that the note of December 30, 1986, in the original amount of $350,000 was marked and stamped "PAID" on April 14, 1992. The annual interest rate on that note was 10.5 percent per annum and salutary to the Bank, the annual interest rate on unpaid amounts was 18 percent per annum. The promissory real estate lien note of December 6, 1991, in the amount of $36,000 bearing 8 percent interest per annum on unpaid principal and an interest rate on matured, unpaid amounts at 18 percent per annum was marked and stamped "PAID" on April 14, 1992, with an identifying signature. Also, the real estate note of December 17, 1991, for $9,996.87 bearing 8 percent interest per annum on unpaid principal and 18 percent per annum on matured, unpaid amounts was marked and stamped "PAID" on April 14, 1992.

Nevertheless, the judgment was entered against Larry in favor of the Bank for $42,-726.06 plus 18 percent per annum interest. As noted above, the three recoveries against Larry and Etoile were based on the three notes marked "PAID". The loan numbers actually prove that the judgment allowed large amounts of money to be awarded in favor of the Bank, being Loan Numbers 200–5636, 200–5615, and 200–2640. In addition to the sworn proof of Larry and Etoile, the documentary evidence in our record definitely creates genuine issues of material facts. Thus, although the Bank marked and stamped the notes "PAID", nevertheless, the Bank recovered large sums of money on these notes; the loan numbers prove this— *i.e.*, substantial recoveries on notes *marked and stamped "PAID"*. This documentary evidence, we conclude, defeats the motion for summary judgment; the Bank is unhorsed.

 In brief, the record raises the issue of payment or at least partial payment of the notes. Pleadings are not proof. Pleadings do set the parameters of the issues raised and the defenses urged. The Allens have affirmatively pleaded the defenses of accord and satisfaction, estoppel, failure of consideration, fraud, payment, release, and waiver. The Allens' pleadings are verified.

And, indeed, on April 14, 1992, the three previous identified notes were actually marked "PAID" by the Bank. Larry and wife relied on the letter of April 10th, stating his total maximum dollar liability would be $27,488. Otherwise, he vows that he would not have signed the so-called IRS note in the original principal amount of $41,818 nor would Larry have signed the settlement statement and the other closing documents consummating the transaction which resulted in the sale of the property to the Suttles. Larry assigned any remaining escrow funds held by First Surety Title Company to be paid directly to the Bank. Then because of certain transactions taking place, Larry contends that the amount to be paid back to the Bank could not exceed $14,330.

A settlement statement shows a payoff of the first mortgage loan to the Bank in the sum of $390,000. Importantly, Larry swore that the Bank agreed to write down the three previous notes to $390,000. Larry swore the Bank was paid in full on these notes and that neither Etoile nor Larry had any further liability whatsoever under any of the three original notes above mentioned.

Ultimately, Larry's affidavit takes the position that his liabilities to the Bank, if any, should be greatly reduced. Larry asserts that neither he nor Etoile owe the bank any money. This affidavit alone, admittedly

made by a notemaker and a defendant and certainly a party at interest, nevertheless, must be taken by us to be true. This affidavit alone raises numerous issues and the same are genuine issues of material facts concerning the amount of money, if any, owed by the Allens to the Bank.

Larry alone signed the assignment of funds whereby the title company was to pay the escrow funds that were not paid to the IRS back directly to the Bank for credit on the Allens' behalf. Etoile did not sign this assignment.

Importantly and significantly, there exists also an affidavit of one Tom Bartley, a practicing attorney in Conroe, Montgomery County. He had been practicing law continuously in that county since 1977. His affidavit took the position that certain attorneys' fees charged by the Bank or the Bank's attorney were unreasonable in amount. The affidavit also attacked the attorneys' fees on the basis that the attorneys' work allegedly to have been done on this file, simply had not been done. This also creates a genuine issue of a material fact on attorneys' fees.

Under accepted rules, we are obliged and constrained to reverse the judgment below and remand the cause for trial on the merits. We sustain appellants' point of error number one.

The judgment is skewed in view of the summary judgment proof of the appellants, the Allens. The judgment self-destructs in view of the Bank's documentary evidence. The judgment below is reversed, the cause is remanded for a full trial on the merits. In addition thereto, and as an additional, separate, and distinct ground for our holdings, we have found error and in the interest of justice we, as a separate basis, reverse the judgment below and remand the cause for a full trial on the merits.

REVERSED AND REMANDED.