# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-16-00789-CV

Pine Forest Investments Group, LLC, Appellant

v.

The County of Bastrop, Texas; The Bastrop Independent School District;
and the City of Bastrop, Texas, Appellees

FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT
NO. 052-21, HONORABLE CARSON TALMADGE CAMPBELL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Pine Forest Investments Group, LLC ("the Developer") complains of the trial court's final judgment in favor of appellees Bastrop County, Bastrop Independent School District, and the City of Bastrop (collectively, "the Bastrop Entities"). The dispute arises out of a 2012 real estate contract under which the Developer sought to purchase 262 lots in the Pine Forest Subdivision. As explained below, we affirm the trial court's judgment in part and reverse and remand in part for proceedings related to the Developer's claims pursuant to the Texas Open Meetings Act ("TOMA"). *See* Tex. Gov't Code §§ 551.001-.146.

### Factual and Procedural Summary

This case is grounded in a long, contentious, and complicated background. The factual summary below is taken from the pleadings and attached evidence and the testimony and exhibits produced at the various hearings before the trial court. The Pine Forest Property Owners

Association ("the Association") is a non-profit corporation formed in 1978 to govern the subdivision, which consists of multiple "units" of lots—Unit 6, which is where the 262 lots in question are located, and Units 7 through 12. The articles of incorporation state that a voting member in the Association is a person or entity "who is the owner of a fee interest or of the equitable title in any lot" in the subdivision and that ownership is deemed to have vested "upon delivery of a duly executed deed or contract" to the buyer. The original Unit 6 Declaration of Covenants, Conditions, and Restrictions (CCRs), executed in 1979, define owner as "(i) the record owner . . . of the fee simple title and (ii) any lot purchaser who is purchasing his or her or its lots under an agreement for deed," and provide that "[e]ach Owner shall automatically be a member of the Association with a right to one vote for each whole Lot or Reserve owned." The CCRs could only be amended by a vote of at least one-third of the owners. Units 7 through 12 are governed by their own CCRs, but those documents do not appear to have been introduced into evidence. The Association is operated by a board of directors, and the two sets of CCRs govern how board members are elected.

This dispute arises out of a 2012 real estate contract ("the Contract") under which the Developer agreed to buy a total of 262 lots in Unit 6 from the Bastrop Entities and the Association.[1] The Bastrop Entities had acquired ownership of the lots largely through foreclosure. The Developer, acting through its managing partner, Robert Leffingwell, agreed to pay $2,000 per lot and to provide infrastructure for Unit 6. The Contract imposed two "conditions precedent"—the first required that a "final construction Development Agreement" be approved by the City before the closing date and

---

[1] The Bastrop County Water Control and Improvement District and the Bastrop County Emergency Services District No. 2 were also sellers under the contract but are not part of this appeal.

the second required that the Association execute the contract within 180 days of the date the first party signed it. The Contract also provided that the sellers would provide the Developer with a commitment for title insurance within forty-five days of the date the title company was given a copy of the Contract; that the Developer could object in writing to any defects, exceptions, or encumbrances to title disclosed in the commitment within thirty days or before closing, whichever was earlier; and that the selling entities "shall cure the timely objections of [the Developer] or any third party lender within 181 days after [the selling entities] receive[] the objections and the Closing Date will be extended as necessary. If objections are not cured within such 181 day period, this contract will terminate and the earnest money will be refunded to [the Developer] unless [the Developer] waives the objections." The Contract stated that closing "shall be held" on or before 180 days after the Developer receives the title commitment, subject to possible extension related to objections to the title commitment. The first of the Bastrop Entities executed the contract on February 21, 2012, and Leffingwell signed it on behalf of the Developer on October 15, 2012.

A title company soon sent the Developer a title commitment containing numerous "exceptions to title," largely due to the fact that the properties were acquired by the Bastrop Entities through foreclosure. Leffingwell testified that the Developer objected to those exceptions and never waived those objections. Although Leffingwell seems to have sought a title commitment elsewhere, the Bastrop Entities never cured the Developer's objections.

Following execution of the Contract, on September 14, 2012, the City and the Developer signed a Development Agreement ("the Agreement") setting out the Developer's duties with regard to the infrastructure it was to provide to the subdivision. The Agreement provided that

the Developer would submit to the City a Master Drainage Plan within ninety days and specified that Developer's failure to do so "shall result in an automatic and full termination of the Agreement" unless the City specifically agreed in writing to an extension of time. The Agreement would "only become fully and finally effective" when the City's engineer reviewed and accepted the Master Drainage Plan, and the City had the right to terminate the Agreement in the event of the Developer's "uncured material default," breach, or failure "to meet any stipulated time frames for deliverables or other performance requirement . . . after written notice and reasonable time to cure." The Developer provided a "Master Drainage Study" on December 12, 2012, and on January 3, 2013, the City asked the Developer to provide additional information and verify certain items. The City reminded the Developer that its "review cannot be completed until the comments of this letter have been addressed" and that the drainage study was required under the Agreement and was "the first step prior to submitting construction/development plans." The Developer did not provide the requested information or an updated drainage plan, and the parties never closed on any of the lots.

On June 4, 2013, the City wrote a letter informing Bastrop ISD that the city council had determined that the Developer "has failed to timely submit . . . a complete, sealed Master Drainage Plan" or request an extension of time for that plan and that "this failure has resulted in an automatic and full termination of the Agreement." On June 5, 2013, the City sent the Developer a letter stating that the Agreement was "now automatically and fully terminated" because the Developer had not responded to the City's notice of deficiencies in the drainage plan or asked for an extension of time. The City reminded the Developer of its contractual duty to submit a "complete Master Drainage Plan" and stated that the deficiencies noted by the City Engineer had to be

4

addressed before the proposed Drainage plan would be considered a complete and final submission. On June 10, the County commissioners court convened a meeting and voted to reject amendments to the Contract proposed by the Developer. On June 12, Bastrop County informed the Developer that the commissioners had voted to reject the amendments and to consider the Contract "void on its own terms," stating that "[t]here is no valid contract for the sale of lots," the Developer "does not have any interest, equitable or otherwise, in the lots," and the Developer "does not have any authority to vote the County of Bastrop's properties at any property owners' association meeting."

At a June 13, 2013 Association board meeting, board president John Gardner told the board that although the County and the City had "canceled the contract," the Developer "has equitable title, and thus, contractual rights." Gardner said the Developer had "secured equitable title [to the 262 lots] two weeks before the City and the County reneged."[2] In September 2013, the Association held a meeting and voted to amend the Unit 6 CCRs, which required approval by at least one-third of the Unit 6 lots. Fifty-six non-developer-owned lots voted against the amendments, fifty-seven non-developer lots voted for them, and the Developer added 262 votes in favor—the board minutes stated the Developer had "record title under contract" for those lots.[3] Among other things, the amended CCRs gave the board sole discretion to "sever one or more Lots from the jurisdiction of the Association if deemed reasonable and prudent." The amended CCRs also gave

[2] On June 14, 2013, the Developer sued the Bastrop Entities for breach of contract, but the lawsuit was dismissed after the Entities raised the defense of sovereign immunity.

[3] Noe Reyes, an attorney who represented the County and Bastrop ISD in the real estate transaction, testified that the Bastrop Entities knew about the efforts to amend the CCRs because the Developer asked the Entities for proxies to vote on the 262 lots. Reyes said that the Bastrop Entities did not give the requested proxies and that "it was also stated to [the Developer] in my law firm's letter back on June 4th, I believe, or 14th that said you are not allowed to vote our lots."

5

the Developer exclusive development rights for an eight-year "development period" and stated that provisions related to developer privileges could not be amended, modified, or replaced during that period. On April 11, 2015, representatives of the Bastrop Entities attended the annual membership meeting, but the president of the board would not allow the Entities to vote for the 262 lots in question and instead again allowed the Developer to cast votes for the 262 lots. The CCRs were amended similarly to the 2013 amendments, providing that a member of the Association was a record owner of fee simple title or any purchaser under an agreement for deed; giving the board the ability to sever lots from the Association's jurisdiction; and giving the Developer exclusive development rights for eight years.

Meanwhile, on April 9, 2015, the Bastrop Entities filed this suit, seeking, among other things, a declaration that the Contract was "null, void, ineffective and of no legal merit" because the Developer had not complied with the Contract's conditions precedent; had breached the Agreement, which was a condition precedent to the Contract; and lacked sufficient funding to perform under the Contract. The Bastrop Entities sought a declaration that the Developer had "misappropriated" their voting rights in the Association and that any actions taken by the Association based on votes cast by the Developer were null and void. The Bastrop Entities also sought an injunction barring the Developer and anyone acting in concert with the Developer from misappropriating the Entities' voting rights. The Developer answered and counterclaimed for specific performance, later asserting an additional counterclaim alleging TOMA violations related to what it claims was an improper executive session held by the City on May 28, 2013. The Association intervened on the side of the

6

Developer in August 2015, and in September 2015, the trial court signed a scheduling order setting the matter for a bench trial on May 5 and May 6, 2016.

The Bastrop Entities filed a motion for partial summary judgment asserting that as of April 11, 2015, the date of the Association's annual meeting, and December 21, 2015, they were the owners of the lots in question and entitled to vote as members of the Association. The Bastrop Entities pointed to the Association's governing documents and argued that they held record title and that there was no agreement or contract for deed under which the Developer might assert an "equitable right" to the lots. On January 13, 2016, the trial court held a hearing on the motion, and about a week later, it signed an order determining that as of April 11 and December 21, 2015, the Bastrop Entities were the record owners of and entitled to vote on behalf of the lots.[4]

On February 6, 2016, the Association's annual membership meeting was held. Clifton Seidel, Drusilla Rogers, and Brenda Winkler were elected to the board of directors, and John Gardner and William Haschke were voted off the board. On February 16, the Bastrop Entities issued a notice of a special Association meeting to be held February 27, seeking to declare null and void the 2013 and 2015 CCRs; to reaffirm the original CCRs; and to remove John Clark and Robert Leffingwell from the board. On February 19, the board held a special meeting in which four of the seven board members voted to sever 100 lots from the Association's membership, including the lots owned by Seidel, Winkler, and Rogers. On February 24, Clark emailed Seidel, Winkler, and

---

[4] The Contract related to the sale of 262 lots in Unit 6. However, the trial court's order granting partial summary judgment found that the Bastrop Entities owned in total 388 lots in the Association's jurisdiction as of April 2015 and 394 as of December 2015. It appears from the record that those almost 400 lots are within Unit 6 and that the Bastrop Entities' ownership increased after 2012 due to foreclosure or other tax-related proceedings.

Rogers to inform them that they had been removed from the board. On February 25, the board held another special meeting at which they severed the remaining Unit 6 lots from the Association and appointed Gardner and Haschke back onto the board. That meeting was very contentious, with Seidel insisting that he, Winkler, and Rogers were still board members and Clark largely refusing to allow or answer questions from those individuals.

On February 27, a special membership meeting called by the Bastrop Entities was held. Clark asserted that the meeting had not been properly called because the Bastrop Entities did not own enough lots in Units 7 through 12, and he and three board members voted to adjourn and then left the meeting. The Bastrop Entities continued with the meeting, and the vast majority of the lot owners in all units voted to remove Clark and Leffingwell from the board. Excluding the 262 lots voted by the Bastrop Entities in favor of both removals, the non-Entity-owners voted eighty-three to two to remove Clark and eighty-four to one to remove Leffingwell. All forty-three non-Entity owners of Unit 6 lots present at the meeting voted to declare the 2013 and 2015 CCRs invalid and to reaffirm the original CCRs.

In March 2016, Clifton Seidel and Drusilla Rogers ("Intervenors") intervened in the lawsuit, naming John Gardner, John Clark, Robert Leffingwell, and William Haschke as third-party defendants and seeking declarations about the validity of the 2013 and 2015 CCRs, the Unit 6 severance, Intervenors' removal from the board, and the appointment of Gardner and Haschke. Intervenors asserted that although the 2013 CCRs recited that one-third of the owners had ratified the changes—specifically that fifty-seven "non-developer lots" and the "262 lots over which [the Developer] holds record title under contract" voted in favor of the changes while only forty-six

8

"non-developer owned lots" voted against—the Developer improperly voted as "the purported equitable owner" when the Bastrop Entities were instead the owners; Intervenors made similar allegations about the 2015 CCRs. In April 2016, the third-party defendants filed their own request for declaratory relief, asking the trial court to declare that the February 2016 severance of Unit 6 from the Association was valid.[5]

The Bastrop Entities filed a motion to enter an amended scheduling order, asking the court to reset the original May 5 bench trial and instead set "a partial nonjury trial on May 3, 2016 regarding the declaratory relief sought with respect to the actions of" the Association and its board; the Entities asked the court to sign the amended scheduling order "so that there will be certainty regarding the matters to be tried nonjury before the court on May 3, 2016." The third-party defendants then filed a notice setting a hearing on their request for declaratory judgment for May 3. The Bastrop Entities filed a cross-claim against the third-party defendants[6] and a notice of non-jury trial on May 3 on that cross-claim and on their request for declaratory relief "regarding the unlawful actions of [the Association] and its former Board of directors." The trial court then signed an amended scheduling order stating that a "nonjury trial" was set for May 3 "with respect to [the Bastrop Entities'] complaints regarding the actions of the Association, the voting rights of members

---

[5] The third-party defendants asserted that the severance was proper even if the Unit 6 CCRs were improperly amended because the CCRs for Units 7 through 12 were amended to allow the board to sever lots from the Association's jurisdiction and were never challenged.

[6] The Bastrop Entities' cross-claim sought declarations similar to its pleadings against the Developer, largely asking the trial court to declare that the Developer had lacked authority to vote for the 2013 CCRs, that the 2013 and 2015 CCRs were not properly ratified by the owners, that the board lacked authority to sever Unit 6 from the Association's jurisdiction, and that Seidel, Rogers, and Winkler were still current board members.

of the Association, and Cliff Seidel and Drusilla Rogers' Plea in Intervention and Third-Party Petition for Declaratory Judgment and Application for Temporary Injunction."

A three-day hearing was held starting on May 3, and at the conclusion, the trial court stated, "The real estate contract that's the subject of this suit is—has terminated and it is null and void. It has no effect. The Court will adopt the [Bastrop Entities'] grounds in evidence that the contract is terminated and is null and void." The court went on to make statements related to actions taken by the Association and its former president, stating that Gardner told the Association's board a "falsehood" in stating that the Developer, through Leffingwell, had "secured equitable title."[7] The court stated that it was denying the relief sought by the third-party defendants and was granting most of the relief sought by the Bastrop Entities in their original petition. The court stated who the board members were as of February 6, 2016. A follow-up hearing was held on May 18 to address whether certain board members should be removed. At the conclusion of that hearing, the trial court and the parties' attorneys discussed drafting a final judgment and the possible severance of the Association's remaining claims, noting that there was uncertainty as to whether the court-declared board members would want to proceed on those claims. On September 21, the trial court signed a final judgment in favor of the Bastrop Entities.

---

[7] We note that although the trial court stated at the conclusion of the May hearing that it believed Gardner had told a "falsehood," it later removed that language from the proposed final judgment submitted by the Bastrop Entities, instead stating that Gardner "erred" in suggesting that the Developer held equitable title.

## Discussion

In its first issue, the Developer argues that in the hearing or bench trial held May 3 through May 5, the trial court erroneously resolved matters that "had not been pleaded such that they were not noticed prior to trial" and were not identified in the trial setting and that it improperly made its rulings "without the benefit of discovery." In its second issue, in which it argues that the court erred in ruling that the Developer did not have equitable title to the lots in question so as to vote in the Association meetings, the Developer insists that questions related to equitable title "were not identified as contested issues in any pleading" filed by the Bastrop Entities, were not properly noticed as issues to be addressed in the hearing, and "were not the subject of any pre-trial discovery." It further argues that the court erred in making its determinations that the Developer did not have equitable title to the lots so as to allow it to vote in the Association meetings. In its third issue, the Developer contends that the trial court improperly disposed of its TOMA claims without hearing argument or evidence on those issues. We will consider the Developer's issues related to notice first.

As a preliminary matter, the Developer asserts that the court proceeded to trial when "no discovery had been conducted/allowed." However, the Bastrop Entities filed their original petition in April 2015, discovery was not stayed until March 2016,[8] and the record reflects that some

---

[8] At the conclusion of the hearing on March 9, counsel for the Bastrop Entities raised concerns about pending discovery requests, a looming April 4 discovery deadline, and the May 4 trial setting. One of the attorneys said that he would be on vacation the following week and that "the two weeks after that we have a full set of discovery to try to get ready on the other issues in the case," and he raised concerns about the trial setting because the issue of "who's going to be on the board" was still pending. The trial court said, "I'm just going to stay everything until we come back here April 5th." At the hearing on April 5, discovery was not discussed, nor did the court indicate that it was lifting its stay.

11

amount of discovery did in fact take place between April 2015 and March 2016. Furthermore, at a hearing in January 2016, the trial court urged the parties to finish discovery, noting that April 5 was the discovery deadline. Indeed, at that hearing, counsel for the Developer, in response to a motion for continuance filed by the Bastrop Entities, stated, "Your Honor, there's been an adequate time for discovery. It's been—we've been going through discovery for six months." Thus, the Developer's statements that there was no discovery conducted or no opportunity for discovery related to the validity of the contract are not supported by the record.[9]

We now consider whether the trial court improperly exceeded the scope of the issues set for the May 3 hearing in declaring the Contract terminated.

As explained earlier, the Bastrop Entities filed a motion to enter an amended scheduling order, asking the court to set "a partial nonjury trial on May 3, 2016 regarding the declaratory relief sought with respect to the actions of" the Association and its board of directors, asking for an amended scheduling order "so that there will be certainty regarding the matters to be tried nonjury before the court on May 3, 2016." The third-party defendants set their request for declaratory judgment for hearing on May 3. The Bastrop Entities set their request for declaratory relief "regarding the unlawful actions of [the Association] and its former Board of directors" and its cross-claim against the third-party defendants for "non-jury trial" on May 3. The trial court signed

---

[9] As support for its assertion that "no discovery had been conducted/allowed," the Developer provides a citation to the record. However, that cite is to the portion of its motion for new trial stating that the trial court had stayed discovery, resulting in the cancellation of planned depositions. *See San Miguel v. City of Windcrest*, 40 S.W.3d 104, 111 (Tex. App.—San Antonio 2000, no pet.) (pleadings are not evidence); *Minns v. Piotrowski*, 904 S.W.2d 161, 169 (Tex. App.—Waco 1995, writ denied) (argument by counsel is not evidence).

12

an amended scheduling order stating that "[o]n May 3, 2016, a nonjury trial is set with respect to [the Bastrop Entities'] complaints regarding the actions of the Association, the voting rights of members of the Association, and Cliff Seidel and Drusilla Rogers' Plea in Intervention and Third-Party Petition for Declaratory Judgment and Application for Temporary Injunction." Thus, it appears from the record that the parties were on notice that the May 3 hearing would address arguments related to who had the right to vote on behalf of the lots in question, the validity of the 2013 and 2015 Unit 6 CCRs and the Unit 6 severance, and who the proper board members were.

At the beginning of the hearing, the trial court announced that it would start with the Bastrop Entities' request for declaratory relief. Counsel for the Bastrop Entities began, saying that "the issue of who the owner is with respect to the votes that were taken at various times is going to be an important issue that the Court would have to consider" and noting that the trial court had already ruled in January on the issue of "who is an owner in a Property Owners' Association."[10] He stated that the court would have to make a decision related to the "distinction between a real estate contract, a purchase money real estate contract, and a contract for deed"; explained why the Contract was a "typical real estate contract" and not a contract for deed; asserted that the Developer did not close on or take title to any of the lots; explained that the Bastrop Entities had given the Developer

---

[10] In its brief, the Developer accurately states that in January 2016, the trial court held a hearing on the Bastrop Entities' motion for partial summary judgment related to its voting rights in April and December 2015 and on a no-evidence motion filed by the Developer, related to whether it was financially unable to uphold its duties under the contract, and "took both motions under advisement." However, the Developer then states that the court "carried rulings on questions of the authority to vote on behalf of particular lots subject to the Contract until" the May hearing, when the record reflects that shortly after the January hearing, the trial court signed an order granting summary judgment as to the Bastrop Entities' ownership and voting rights as of April and December 2015.

13

notice that the Agreement, which was "a condition precedent to the real estate contract," had terminated; and stated that the Entities had terminated the contract well before the September 12 board meeting at which the Developer voted on behalf of the lots. Counsel for Intervenors noted that there had been "discussion about voting rights being tied to equitable interest" and argued that voting rights were only obtained with record title or a contract for deed. The Developer's attorney then began his opening statement, saying, "Briefly, this case is about a breach of contract. We—the questions to resolve then are: Was there a contract and who breached. . . . [W]e still haven't resolved the simple question was there a contract. . . . This Court has never resolved that question of whether or not there was an effective contract in the first place." Counsel referenced Intervenors' discussion of equitable title and stated that the Developer had spent considerable time and money and "certainly demonstrated an equitable interest in these lots," several times reiterating that the trial court would have to determine first whether there was a contract and second who had the authority to vote the lots. Thus, the parties seemed to place the Contract's validity front and center in the issues that the trial court would have to determine in order to declare ownership and the accompanying voting rights.

Following opening statements, the attorneys conferred and stated to the trial court that they believed the various declaratory claims "intermix[ed] and intertwine[d]" and that they "would like to present all of the evidence and just argue them all at one time." The parties then proceeded to present their evidence over three days. At the conclusion of the hearing, the trial court several times asked if the attorneys wanted to call further witnesses, and each time counsel for the Developer demurred, never raising concerns about witnesses being unavailable or about the court having strayed

14

beyond the scope of the notice of the hearing. At the conclusion of the hearing, when the trial court stated that the Contract "has terminated and is null and void," there were no complaints raised that the court had gone beyond the noticed scope of the hearing, nor did the Developer complain at the follow-up hearing about two weeks later about the decision related to the validity of the Contract.

Similarly, although the record does indicate that some, if not all, of the planned depositions were never conducted, the record does not reflect that the attorneys informed the trial court that there were facts still to be discovered that might cast a different light on questions of the Contract's validity or the concomitant ownership of the lots. Nor have we found an indication that the Developer objected to a lack of discovery or depositions at either the May 3 hearing or the follow-up hearing. Not until its motion for new trial did the Developer assert that the matters presented to and decided by the court exceeded the scope of the notice of hearing and that it had not been able to present certain unspecified witnesses or evidence.[11]

Considering the intertwined nature of the questions of the Contract's validity and the voting rights, the trial court's earlier decision that the Bastrop Entities owned the lots in question, the assertions by counsel for the Developer that the case concerned breach of contract and whether the Contract was ever effective, the Developer's arguments related to whether it could assert equitable title, and the Developer's failure to object during the hearing or upon the trial court's stating its decision related to the Contract, we hold that the Developer has waived any error relating

---

[11] We note that the Bastrop Entities in the April hearing said that they "can't complete what [discovery] we need to do for the contract by—by May." However, the Bastrop Entities did not object during the May hearing that there was unfinished discovery that would be relevant to the issues being addressed.

15

to notice. *See Pointer v. State*, No. 03-02-00548-CV, 2003 WL 21241261, at *2 (Tex. App.—Austin May 30, 2003, pet. denied) (mem. op.) (appellant, who participated in trial, did not complain about lack of notice or scope of trial, and thus waived any complaint); *Hoog v. State*, 87 S.W.3d 740, 745 (Tex. App.—San Antonio 2002, pet. denied) (party waived complaint of insufficient notice that hearing was full evidentiary hearing by failing to object, failing to move for continuance, and fully participating in hearing).[12]

The Developer also asserts that the issue of equitable title should not have been considered because it had not been "identified as contested issues in" the Bastrop Entities' pleadings or the notices of the May 3 hearing. However, the claim of equitable title was raised by the Developer and the Association in their arguments of how the Developer was entitled to vote for the 262 lots, and the Bastrop Entities were not required to plead the Developer's defensive answer to the Bastrop Entities' assertion that they held record title. *See Rosales v. Williams*, No. 01-09-00454-CV, 2010 WL 457536, at *3 (Tex. App.—Houston [1st Dist.] Feb. 11, 2010, no pet.) (mem. op.) (plaintiffs "had no obligation to anticipate defenses and plead those issues"). Further, the issue of equitable title was raised and explored at the May 3 hearing without objection.

---

[12] Because the issue of the Contract's validity was pled by the parties, this case does not fit into the case law governing trial of an unpled issue by consent, as in the cases cited by the Bastrop Entities. *See, e.g.*, *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 771 (Tex. App.—Dallas 2005, pet. denied) (discussing when unpled issue is considered tried by consent). However, the same general guidelines can be applied: significant evidence and testimony related to the validity of the Contract was presented at the hearing, the attorneys' arguments and questioning of witnesses indicated that the parties understood that the issue was being considered, and there were no objections to questioning along those lines or to the trial court's announcement of its decision.

16

We overrule the Developer's first issue, asserting a "procedurally flawed 'bench trial,'" and its associated arguments in its second issue related to the scope of both the May 3 hearing and the trial court's resulting decision as to the Contract's validity.

In its second issue, the Developer argues that the trial court erred in ruling that the Developer did not have equitable title to the lots in question so as to allow it to vote on behalf of those lots in the Association meetings. The Developer insists that it acquired equitable title under the Contract, thus entitling it to vote under the Association's governing documents, and that "[t]he record also demonstrates that, for purposes of section 209.002(6) of the Property Code, all one needs to do to transform an equitable title into a record title is to record the purchase agreement with the real estate records of Bastrop County." As support for that assertion, the Developer cites to an email sent by then-board-president John Gardner on May 29, 2013, explaining why the Association would allow the Developer to vote the lots in question in the June 13, 2013 meeting. In that email, Gardner says that the property code "requires only 'record title,'" and then states:

> There are several kinds of titles that can be created in real estate, including "determinable title," "fee simple title", and "equitable title." All one need do to transform an "equitable title" into a "record title" is to record the purchase agreement in the real estate records of Bastrop County. This will cause the equitable title to become a "record title" within the meaning of Section 209.002(6) and supersedes the legal title of the seller and qualifies one as an "owner" under the statute as well as under our Unit 6 CCRs and our [Association] Articles and by-laws.

However, Gardner's beliefs that recording the Contract in the Bastrop County real estate records either gave the Developer equitable title or transformed its equitable title into record title are not proof of the correctness of those opinions. *See Lawrence v. City of Wichita Falls*, 122 S.W.3d 322,

17

328 (Tex. App.—Fort Worth 2003, pet. denied) ("an expert's opinion on an ultimate issue is admissible only if a predicate is laid to show that the expert knows the proper legal definition in the question"); *Adamson v. Burgle*, 186 S.W.2d 388, 399 (Tex. Civ. App.—San Antonio 1945, writ ref'd w.o.m.) (expert "may not state a legal conclusion or an opinion involving a matter of law").

Our sister court has explained that "record title" is "title as it appears in the public records after the deed is properly recorded," *Longoria v. Lasater*, 292 S.W.3d 156, 165 (Tex. App.—San Antonio 2009, pet. denied) (citing *Record title*, Black's Law Dictionary (8th ed. 2004)), and there is no indication that deeds for the lots were ever transferred to the Developer or properly recorded in the County's records.[13] In fact, the testimony established that the Developer never closed on any of the lots. We have not found cases indicating that the filing of a pending real estate contract in the local property records suffices to establish "record title," and the Developer does not cite us to any useful authority. We thus affirm the trial court's conclusions that the Developer did not have record title of the lots in question.

As for whether the Developer had equitable title, the Developer simply asserts that it did. Its substantive argument relating to equitable title reads as follows:

> The question then arises whether [the Developer] assumed equitable title by operation of the Contract. According to the Articles of Incorporation of [the Association], it clearly did.

---

[13] Even if the recording of the Contract in County records had established "record title," the Developer does not cite evidence in the record showing that the Contract was recorded, although the trial court's findings of fact and its final judgment refer to a "Memorandum of Contract for the Sale and Purchase of Land" filed by Gardner with the County Clerk on June 4, 2013.

18

The Contract made the 262 lots held by Bastrop subject to the CCRs and articles of incorporation of [the Association]. Pursuant to those documents, once the Contract was recorded with the Bastrop County Records office, [the Developer] assumed equitable title to the lots pending the transfer of full title. Accordingly [the Developer] not only had equitable title, the trial court erred in first announcing on May 6, 2016, and then rendering final judgment and entering findings of facts that it lacked equitable title, that Robert Leffingwell had no basis to contend [the Developer] held such title, and that [then-board-president Gardner] erred in representing that [the Developer] had acquired such title.

Moreover, no evidence, let alone factually sufficient evidence, supported a judgment that [the Developer] lacked equitable title. The trial court explained its holding in that regard by noting that [the Association's] then-president told a "falsehood" to the Association board when he said that Leffingwell had acquired equitable title weeks earlier.[14] In fact, Gardner told the board that [the Developer] had secured equitable title through the Contract, and that the Contract continued even if a party was in breach. The evidence that was offered during the bench trial thus conclusively establishes the contrary to the finding made by the trial court, and alternative confirms that the trial court's ruling is against the great weight and preponderance of the evidence.[15] Thus, the evidence conclusively establishes the contrary to the trial court's conclusion that [the Developer] never possessed equitable title, and at a minimum, such a conclusion is against the great weight and preponderance of the evidence.

The Developer has presented no actual evidence or cited to authority that supports its claim that the trial court erred in deciding that the Developer lacked equitable title. However, even if the issue had been properly briefed, we would hold that the Developer did not obtain equitable title pursuant to this Contract.

---

[14] As noted earlier, the trial court removed the word "falsehood" from its final judgment, instead stating that Gardner "erred" in suggesting that the Developer held equitable title.

[15] The record citation provided by the Developer as evidence of its equitable title is to its motion for new trial, in which it stated that Gardner told the board that the Developer had secured equitable title. However, pleadings are not proof, and a party's statement characterizing what a witness said is not evidence of that testimony. *See, e.g.*, *Collin Cty. Dist. Attorney's Office v. Fourrier*, 453 S.W.3d 536, 541 (Tex. App.—Dallas 2014, no pet.); *Allen v. National Bank of Conroe*, 884 S.W.2d 928, 931 (Tex. App.—Beaumont 1994, no writ.).

19

In our review of relevant case law, the term "equitable title" commonly refers to the interest a buyer obtains in land purchased under a "contract for deed," sometimes referred to an "executory contract." *See Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 429 (Tex. 2005) ("A contract for deed, unlike a mortgage, allows the seller to retain title to the property until the purchaser has paid for the property in full."); *Shook v. Walden*, 368 S.W.3d 604, 624-25 (Tex. App.—Austin 2012, pet. denied) (distinguishing executory contract from "conventional contract for sale of realty, in which the seller and purchaser mutually agree to complete payment and title transfer on a date certain"). "'Equitable title' is a right, enforceable in equity, to have the legal title to real estate transferred to the owner of the right upon the performance of specified conditions." *City of Hous. v. Guthrie*, 332 S.W.3d 578, 588 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also Travis Cent. Appraisal Dist. v. Signature Flight Support Corp.*, 140 S.W.3d 833, 840 (Tex. App.—Austin 2004, no pet.) ("equitable title is defined as the present right to compel legal title"); *Neeley v. Intercity Mgmt. Corp.*, 623 S.W.2d 942, 950-51 (Tex. App.—Houston [1st Dist.] 1981, no writ) ("equitable title is an enforceable right to have legal title transferred to the holder of the equity," and "mere equitable right rises to the dignity of an equitable title when performance under the particular contract occurs, such as payment of purchase money").[16] There is no indication in the

---

[16] *See, e.g.*, *Cullins v. Foster*, 171 S.W.3d 521, 533-34 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("Equitable title may be shown when the plaintiff proves that he has paid the purchase price and fully performed the obligations under the contract. Upon such performance, he becomes vested with an equitable title to the property which is sufficient to allow him to maintain his action in trespass to try title." (quoting *White v. Hughs*, 867 S.W.2d 846, 849 (Tex. App.—Texarkana 1993, no writ))); *Texas Am. Bank/Levelland v. Resendez*, 706 S.W.2d 343, 345-46 (Tex. App.—Amarillo 1986, no writ) (contract that specified conditions for eventual passing of seller's interest was executory contract and "not effective as a conveyance").

record that the Developer had any "present right to compel legal title," *see Signature Flight*, 140 S.W.3d at 840, and the Contract was a conventional real estate contract, intended to pass the Bastrop Entities' interest in the properties to the Developer upon closing within 180 days of the date the title commitment was delivered, not a contract for deed so as to convey equitable title.

Finally, we consider whether the Contract was properly declared terminated. Although the Developer insists that questions related to the Contract's validity were improperly reached, we have overruled that contention. The evidence in the record and the court's findings provide at least three grounds for declaring the Contract had terminated:

- The Bastrop Entities did not cure the Developer's objections to the title commitment, and the Developer never waived those objections; the Contract provided that in such an instance "this contract will terminate."

- The Developer never closed on the Contract, which provided for closing to occur within 180 days "after receipt of the commitment."

- The Contract required the Developer to provide a final Development Agreement and obtain the City's approval of that Agreement before closing. The Developer and the City signed the Agreement, but the Agreement provided that it was not effective until the City engineer had reviewed and accepted the Developer's Master Drainage Plan. The Agreement explicitly stated that the Developer's failure to provide a completed, sealed plan within ninety days would result in "automatic and full termination of the Agreement" unless the City agreed to an extension of the deadline. The Developer submitted a "Master Drainage Study," and the City sent the Developer its comments and requests for more information and detail to be provided in the plan, explaining that the City could not complete its review until its comments had been addressed. The Developer never responded.

The Developer does not explain how the evidence is insufficient to support the trial court's findings related to those Contract provisions, nor does it appear from the record that the trial court lacked an evidentiary basis for those findings. *See Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263

21

(Tex. 2014) (party attacking legal sufficiency of adverse finding on issue on which it did not have burden of proof must demonstrate that no evidence supports finding); *Iliff v. Iliff*, 339 S.W.3d 126, 134-35 (Tex. App.—Austin 2009), *aff'd*, 339 S.W.3d 74 (Tex. 2011) (trial court's findings of fact have same weight as jury verdict and are evaluated under same standards; finding will only be overturned if so contrary to overwhelming weight of evidence as to be clearly wrong and unjust).

The Developer has not shown that the trial court erred in determining that the Developer had never closed on any lots under the Contract, that the Contract terminated on its own terms 181 days after the Bastrop Entities failed to cure the Developer's objections to the title commitment, or that the final Development Agreement—a condition precedent to the Contract's validity—never became effective due to the Developer's failure to comply with the City's request for changes to the drainage plan. The fact that the trial court variously declared the Contract was "terminated," "null and void," "never effective," and "of no effect" is of no importance in reaching our conclusion.[17] *See, e.g.*, *Hitzelberger v. Samedan Oil Corp.*, 948 S.W.2d 497, 503 (Tex. App.—Waco 1997, pet. denied) ("incorrect conclusion of law will be followed if the controlling findings of fact support a correct legal theory"); *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex. App.—Austin 1992, no writ) ("Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence," and

---

[17] Because there are three other grounds on which the Contract can be declared as having terminated on its own terms, we need not address the Developer's arguments related to the Bastrop Entities' reference to or reliance on section 209.0059 of the property code in the hearing on their motion for partial summary judgment, nor need we discuss whether the trial court erred in finding that the Association signed the Contract outside 180 days from the date it was first signed.

incorrect conclusions of law will not require reversal "if the controlling findings of facts will support a correct legal theory.").

In its third issue, the Developer contends that the final judgment is erroneous because the court never heard evidence or argument related to the Developer's TOMA counterclaims. According to pleadings filed by the Developer and the Association, the City held a meeting to discuss the Contract on May 28, 2013, and that meeting "was not held in a public meeting," in violation of TOMA. Therefore, the Developer argued, any actions taken during that executive session should be ruled void. *See* Tex. Gov't Code § 551.141 (action taken by governmental body in violation of chapter 551 is voidable). The record does not appear to include any further information about this alleged executive session. Unlike the issue of the validity of the Contract, the topics set for the May hearing cannot be interpreted as including any TOMA issues. Nor did the evidence or arguments put forth in the May hearing touch on the propriety of the City's executive session. The Developer brought this concern to the trial court's attention in a hearing held after the May 3 hearing, noting that the TOMA counterclaims had not been addressed, but neither the final judgment nor the court's findings of fact and conclusions of law mention the counterclaims. We agree with the Developer that the issue of its claims related to alleged TOMA violations were not properly noticed for or considered in the May hearing. We sustain the Developer's third issue.

The Developer asserts that the error means that the judgment signed in September was "non-final and not subject to appeal" and states that we should dismiss the appeal for want of jurisdiction and return the cause to the trial court to dispose of the remaining claims. However, viewing the language of the order, as well as the record as a whole, we hold that the final judgment

23

was in fact intended to be a final judgment and should be considered as such. *Cf. Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 205-06 (Tex. 2001); *Taborda v. Tamirisa*, No. 14-16-00545-CV, 2018 WL 1476269, at *2-3 (Tex. App.—Houston [14th Dist.] Mar. 27, 2018, no pet.) (mem. op.) (order entitled "final judgment" was not final and appealable because it did not dispose of all claims, record did not include orders of severance or nonsuit, motion for entry of final judgment did not mention claims, and order was premised only on summary judgment and counterclaim). By disposing of the TOMA counterclaims without notice, evidence, and argument on those issues, the trial court erroneously signed a final order granting more relief than the Bastrop Entities had shown themselves entitled to. *See Binder v. Joe*, 193 S.W.3d 29, 33 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("By granting more relief than Danny requested in his petition, the trial court erred, and that error is apparent on the face of the record."); *Labrie v. Kenney*, 95 S.W.3d 722, 728 (Tex. App.—Amarillo 2003, no pet.) (plaintiffs sought declaratory judgment and none of defendant's motions for summary judgment referred to that request, much less presented grounds to justify dismissal of request; thus, in granting summary judgment and dismissing all claims, including request for declaratory judgment, trial court erroneously granted more relief than was requested).

## Conclusion

The Developer has not shown error in the trial court's determinations related to the Contract's validity or the Developer's voting rights. It has, however, shown that the court erred in also disposing of the Developer's TOMA claims. We therefore reverse the final judgment

and remand the cause to the trial court for further proceedings on the Developer's TOMA counterclaims.[18]

 

 

_____

Cindy Olson Bourland, Justice

Before Justices Puryear, Field, and Bourland

Affirmed in Part; Reversed and Remanded in Part

Filed: June 22, 2018

---

[18] Given the complex procedural history and the lack of information provided to us on appeal, or indeed in our review of the record, we have almost no information about the merits of the Developer's TOMA claim. The sum total of the information contained in the record seems to be the assertion by the Developer that the City held an executive session on May 28, 2013, without proper notice, and its request that the actions taken by the City council as to the Developer as a result of that improperly noticed meeting be declared void. *See* Tex. Gov't Code § 551.141 (action by governmental body in violation of TOMA is voidable). We recognize that the Developer's TOMA claim may have been rendered moot by the trial court's determinations related to the Contract's validity. *See Meeker v. Tarrant Cty. Coll. Dist.*, 317 S.W.3d 754, 758-62 (Tex. App.—Fort Worth 2010, pet. denied). However, due to the lack of information provided by the parties, we have no choice but to remand the cause on this issue.